## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>Plaintiff,<br><br>v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.---- |

## COMPLAINT

Plaintiff Mosaid Technologies Incorporated ("Mosaid"), for its complaint against defendant the Honorable David Kappos, states as follows:

1. This is an action by the owner of United States Patent No. 7,521,943 ("the '943 patent") seeking review of inaccurate and erroneous patent term adjustment calculations made by the United States Patent and Trademark Office ("USPTO"). Specifically, this is an action by Plaintiffs under 35 U.S.C. § 154(b)(4)(A) seeking a judgment that the patent term adjustment of 751 days calculated by the USPTO for the '943 patent should be corrected to 1058 days.

2. This action arises under 35 U.S.C. § 154 and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

# I. THE PARTIES

3.  Plaintiff Mosaid is a company operating under the laws of Canada. Mosaid is located at 11 Hines Road Suite 203 Ottawa, Canada K2k 2x1.

4.  Defendant David Kappos is the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office. Defendant is sued in his official capacity.

# II. JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action and is authorized to issue the requested relief to Plaintiff pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1361; 35 U.S.C. § 154(b)(4)(A) and 5 U.S.C. §§ 701-706.

6.  Venue is proper in this district pursuant to 35 U.S.C. § 154(b)(4)(A).

7.  This Complaint is being timely filed in accordance with 35 U.S.C. § 154(b)(4)(A) and FRCP 6(a)(3).

# III. BACKGROUND

8.  The '943 patent issued to Yehuda Binder on April 21, 2009, based on patent application number 11/091,371, filed on March 29, 2005, which claims priority to Israeli patent application no. 166445, filed January 23, 2005. The '943 patent is attached hereto as Exhibit A.

9.  Plaintiff Mosaid is the assignee of the '943 patent and is the real party in interest in this case, as evidenced by an assignment document from the inventors to Serconet Ltd., recorded in the USPTO on January 8, 2006, at Reel/Frame 016985/0812, corrected by a corrective assignment recorded on January 25, 2006, at Reel/Frame 017061/0070, and a change of address recorded on December 23, 2008, at Reel/Frame 022024/0324, and an assignment

document from Serconet Ltd. to Mosaid, recorded in the USPTO on March 25, 2009, at Reel/Frame 022449/0101, and is the real party in interest in this case.

10. When the USPTO issued the '943 patent on April 21, 2009, it erroneously calculated the entitled patent term adjustment ("PTA") for the '943 patent as 751 days. Had the USPTO calculated the entitled patent term adjustment properly, the '943 patent would be entitled to 1058 days of patent term adjustment.

11. The errors in the USPTO's patent term adjustment calculations are detailed in a recent order from the U. S. District Court for the District of Columbia in an action titled *Wyeth* v. *Dudas,* 580 F. Supp. 2d 138 (D.D.C. Sept. 30, 2008), where the Court granted summary judgment against the USPTO, holding that the USPTO's patent term adjustment calculation methodology was erroneous as a matter of law and inconsistent with the Patent Statute.

12. The correct patent term adjustment methodology identified in the prior *Wyeth* v. *Dudas* action governs the USPTO's calculation of patent term adjustment for Plaintiff's '943 patent.

## IV. COUNT I:  U.S. PATENT NO. 7,521,943

13. Plaintiff incorporates by reference the allegations in paragraphs 1-12 above, as if fully set forth herein.

14. During prosecution of the '943 patent, the patent owner accrued 751 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(A), and accrued 388 days of patent term adjustment under 35 U.S.C. § 154(b)(1)(B).

15. Under the USPTO's interpretation of 35 U.S.C. § 154, all PTA accrued under 35 U.S.C. § 154(b)(l)(A) and all PTA accrued under 35 U.S.C. § 154(b)(l)(B) inherently overlaps and, thus, it has been the USPTO position that a patent holder is only eligible for the larger of these two amounts of PTA, 751 days. For the '943 patent, the USPTO erroneously limited

the patent term adjustment for the '943 patent to 751 days (*see* calculation in paragraph 21, below), as shown on the face of the '943 patent.

16.   In view of a recent decision from this Court (*Wyeth v. Dudas, supra*), all days on which 35 U.S.C. § 154(b)(1)(A) or 35 U.S.C. § 154(b)(l)(B) apply should accrue patent term adjustment for the '943 patent.

17.   Each day from the day after May 29, 2006 (14 months from the 371(c) date) through to the issuance of a first action on June 18, 2008, qualify for patent term adjustment under 35 U.S.C. § 154(b)(1)(A), a total of 751 days.

18.   Furthermore, each day from the day after March 29, 2008 (3 years from the actual filing date in the United States) through to the date of issue on April 21, 2009, qualify for patent term adjustment under 35 U.S.C. § 154(b)(l)(B), a total of 388 days.

19.   Under the interpretation of this Court (*Wyeth v. Dudas, supra*), the only period of actual calendar days overlap between the time periods of delay calculated under 35 U.S.C. § 154(b)(1)(A) and 35 U.S.C. § 154(b)(1)(B), from March 29, 2008, until June 16, 2008, which amounts to 81 days, and the total USPTO prosecution delay is accordingly $751 + 388 - 81 = 1058$ days, minus any period attributed to disclaimed term or applicant's delay under 35 U.S.C. § (154(b)(2)(B) or (C).

20.   Plaintiff agrees with the USPTO's holding of a total applicant prosecution delay of 0 days under 35 U.S.C. § 154(b)(2)(B) or (C).

21.   Under the USPTO's interpretation, the USPTO had calculated an erroneous patent term adjustment of $751 - 81 - 0 = 751$ days.

22.   The correct overall Patent Term Adjustment accrued by the patent holder is $751 + 388 - 81 - 0 = \mathbf{1058}$ **days**, and the patent holder is therefore entitled to $1058 - 751 = \mathbf{307}$ **ADDITIONAL days** of patent term adjustment.

4

23.     On June 22, 2009, Plaintiff filed a request for reconsideration of patent term adjustment in

the USPTO (Exhibit B), which set forth the basis for Plaintiff's determination that the PTA

was incorrect.  By decision mailed on August 14, 2009 (Exhibit C), the request was

dismissed and no adjustment was made.

WHEREFORE, Plaintiff respectfully prays that this Court:

A.     Issue an Order changing the period of patent term adjustment for the '943 patent term

from 751 days to 1058 days and requiring Defendant to alter the terms of the '943 patent to reflect

the 1058 days of actual patent term adjustment due the'943 patent.

B.     Grant such other and further relief as the nature of the case may admit or require and

as may be just and equitable.

Dated: October 19, 2009

                                                    Respectfully submitted,

                                                    MOSAID TECHNOLOGIES INCORPORATED

                                                    By: _____

                                                        Roger L. Browdy (DC Bar No. 164,251)
                                                        Ronni S. Jillions (DC Bar No. 375,817)
                                                        BROWDY AND NEIMARK, P.L.L.C
                                                        624 Ninth Street, N.W.
                                                        Washington, DC 20001
                                                        Tel.:  (202) 628-5197
                                                        Fax:  (202) 737-3528
                                                        Email:  rlbrowdy@browdyneimark.com
                                                                rsjillions@browdyneimark.com

                                                    Attorneys for Plaintiff

Address for mail:
BROWDY AND NEIMARK, P.L.L.C.
624 Ninth Street, NW
Washington, DC 20001
(202) 202-628-5197

G:\INT\MosaidvDoll\Binder25\2009-10-19 Complaint Mosaid BINDER25.doc

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>            Plaintiff,<br><br>                        v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. ---- |

# Exhibit A

US007521943B2

(12) **United States Patent**
Binder et al.

(10) Patent No.: **US 7,521,943 B2**
(45) Date of Patent: **Apr. 21, 2009**

(54) **DEVICE, METHOD AND SYSTEM FOR ESTIMATING THE TERMINATION TO A WIRED TRANSMISSION-LINE BASED ON DETERMINATION OF CHARACTERISTIC IMPEDANCE**

(75) Inventors: **Yehuda Binder**, Hod Hasharon (IL); **Ami Hazani**, Ra'anana (IL)

(73) Assignee: **Serconet, Ltd.**, Ra'anana (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 751 days.

(21) Appl. No.: **11/091,371**

(22) Filed: **Mar. 29, 2005**

(65) **Prior Publication Data**

US 2006/0176044 A1    Aug. 10, 2006

(30) **Foreign Application Priority Data**

Jan. 23, 2005    (IL) ..................................... 166445

(51) **Int. Cl.**
  **G01R 27/08**    (2006.01)
  **G01R 27/00**    (2006.01)
(52) **U.S. Cl.** ..................................... **324/691**; 324/71.1
(58) **Field of Classification Search** ................ 324/691, 324/713, 66, 71.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,010,399 A | 4/1991 | Goodman et al. | |
| 5,193,108 A | 3/1993 | Stocklin | |
| 5,621,455 A | 4/1997 | Rogers et al. | |
| 5,633,801 A * | 5/1997 | Bottman ..................... 324/600 |
| 5,734,658 A | 3/1998 | Rall et al. | |
| 5,841,360 A | 11/1998 | Binder | |
| 5,896,443 A | 4/1999 | Dichter | |
| 6,069,899 A | 5/2000 | Foley | |
| 6,108,331 A | 8/2000 | Thompson | |
| 6,216,160 B1 | 4/2001 | Dichter | |
| 6,243,571 B1 | 6/2001 | Bullock et al. | |
| 6,351,533 B1 * | 2/2002 | Parrott ..................... 379/412 |
| 6,396,391 B1 | 5/2002 | Binder | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 768 537 A1    4/1997

(Continued)

OTHER PUBLICATIONS

Fowler, Bill, "Transmission Line Characteristics", National Semiconductor Application Note 108, National Semiconductor Corporation, Jul. 1986, pp. 1-8.

(Continued)

*Primary Examiner*—Timothy J Dole
(74) *Attorney, Agent, or Firm*—Browdy and Neimark, P.L.L.C.

(57) **ABSTRACT**

A system and method for measuring a characteristic impedance of a transmission-line comprises transmitting energy to the line, and shortly after measuring the voltage/current involved and thus measuring the equivalent impedance. The measured characteristic impedance may then be used in order to determine the termination value required to minimize reflections. In another embodiment, the proper termination is set or measured by adjusting the termination value to achieve maximum power dissipation in the terminating device. The equivalent characteristic impedance measurement may be used to count the number of metallic conductors connected to a single connection point. This abstract is not intended to limit or construe the scope of the claims.

**26 Claims, 17 Drawing Sheets**



US 7,521,943 B2

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,480,510 B1 | 11/2002 | Binder | |
| 6,549,616 B1 | 4/2003 | Binder | |
| 6,560,319 B1 | 5/2003 | Binder | |
| 6,625,005 B2 * | 9/2003 | Otsuka et al. ............ | 361/301.2 |
| 6,690,677 B1 | 2/2004 | Binder | |
| 6,842,459 B1 | 1/2005 | Binder | |
| 6,927,340 B1 | 8/2005 | Binder | |
| 6,937,056 B2 | 8/2005 | Binder | |
| 6,956,826 B1 | 10/2005 | Binder | |
| 7,106,721 B1 | 9/2006 | Binder | |
| 7,317,793 B2 | 1/2008 | Binder | |
| 2002/0019966 A1 | 2/2002 | Yagil et al. | |
| 2002/0039388 A1 | 4/2002 | Smart et al. | |
| 2002/0060617 A1 | 5/2002 | Walbeck et al. | |
| 2002/0146207 A1 | 10/2002 | Chu | |
| 2002/0166124 A1 | 11/2002 | Gurantz et al. | |
| 2002/0194383 A1 | 12/2002 | Cohen et al. | |
| 2003/0062990 A1 | 4/2003 | Schaeffer, Jr. et al. | |
| 2003/0099228 A1 | 5/2003 | Alcock | |
| 2003/0112965 A1 | 6/2003 | McNamara et al. | |
| 2003/0139151 A1 | 7/2003 | Lifshitz et al. | |
| 2004/0125819 A1 | 7/2004 | Binder | |
| 2005/0010954 A1 | 1/2005 | Binder | |
| 2005/0025162 A1 | 2/2005 | Binder | |
| 2005/0047431 A1 | 3/2005 | Binder | |
| 2005/0129069 A1 | 6/2005 | Binder | |
| 2005/0180561 A1 | 8/2005 | Hazani et al. | |

| | | |
|---|---|---|
| 2005/0249245 A1 | 11/2005 | Hazani et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 02/25920 A1 | 3/2002 |
| WO | WO 02/065229 A2 | 8/2002 |
| WO | WO 2004/001034 A2 | 12/2003 |

OTHER PUBLICATIONS

True, Kenneth M., "Reflections: Computations and Waveforms", National Semiconductor Application Note 807, National Semiconductor Corporation, Mar. 1992, pp. 1-25.

True, Kenneth M., "Long Transmission Lines and Data Signal Quality", National Semiconductor Application Note 808, National Semiconductor Corporation, Mar. 1992, pp. 1-23.

True, Kenneth M., "Data Transmission Lines and Their Characteristics", National Semiconductor Application Note 806, National Semiconductor Corporation, Apr. 1992, pp. 1-7.

Vo, Joe, "A comparison of Differential Termination Techniques", National Semiconductor Application Note 903, National Semiconductor Corporation, Aug. 1993, pp. 1-10.

Strassberg, Dan; "Home Automation Buses: Protocols Really Hit Home"; EDN Design Feature, Apr. 13, 1995 (9 pages).

Hachman, Mark; "Compaq to Ride The CEBus"; EBN Jan. 22, 1996 (1 page).

Hoffman, J.; "Cable, Television, and the Consumer Electronic Bus"; Panasonic Technologies. Inc., pp. 165-173, no date.

IS-60.04; Node Communications Protocol Part 6: Application Layer Specification; Revision Apr. 18, 1996, (129 pages).

Markwalter, Brain et al; "CEBus Router Testing"; IEEE Transactions on Consumer Electronics Nov. 1991, vol. 37 No. 4 (8 pages).

Grayson Evans, The CEBUs Standard User's Guide, 1st edition, May 1996, 317 pages.

* cited by examiner



**Figure 1 (Prior-Art)**



**Figure 1a (Prior-Art)**



**Figure 2 (Prior-Art)**



**Figure 3**



**Figure 4**



**Figure 5**



**Figure 6**



Figure 7



Figure 8a (Prior art)



Figure 8b



Figure 9



**Figure 10**

**Figure 12**



Figure 11



Figure 13 (Prior art)



Figure 14 (Prior art)



**Figure 16**



**Figure 15**



**Figure 18**

**Figure 17**

US 7,521,943 B2

<div style="columns">

1

# DEVICE, METHOD AND SYSTEM FOR ESTIMATING THE TERMINATION TO A WIRED TRANSMISSION-LINE BASED ON DETERMINATION OF CHARACTERISTIC IMPEDANCE

## FIELD OF THE INVENTION

The present invention relates to the field of measuring transmission-line parameters, and specifically the characteristic impedance of a transmission line.

## BACKGROUND OF THE INVENTION

Wired communication network topologies may generally be segmented into two types: Point-to-point and multipoint (also known as 'point-to-multipoint', 'bus' and 'shared medium') networks. In point-to-point topology, the network employs one or more communication links, each link is based on a cable or wires as the communication medium and connects exactly two nodes, wherein each node is connected to an end of the cable or wires. In multipoint configuration, multiple nodes are connected in parallel to the same wired medium is various points along the cable. Non limiting examples of point-to-point based communication networks are Local Area Network (LAN) Ethernet IEEE802.3 10BaseT, 100BaseTX, EIA/TIA-422 (a.k.a. RS-422), ISDN (U-Interface), EIA/TIA-449, IEEE1284, IEEE1394 and USB, and Wide Area Networks (WAN) such as HDSL (High speed Digital Subscriber Line), ADSL (Asymmetric Digital Subscriber Line) and other xDSL technologies (e.g. SHDSL, SDSL, VDSL, IDSL). Non-limiting examples of LANs employing multipoint topology are Ethernet IEEE802.3 10Base2, 10Base5, CAN, LON, and EIA/TIA-485 (a.k.a. RS-485). Other multipoint in-home networks include telephone line based communication such as HomePNA™ (Home Phoneline Networking Alliance), described in www.homepna.org, and powerline based communication such as HomePlug™, described in www.homeplug.org.

A non-limiting example of a unidirectional point-to-point communication link is shown as network **5** in FIG. 1. The network comprises a communication link based on two conductors $11a$ and $11b$ cable. A transmitter $14a$ is connected to one end of the cable at points $7a$ and $7b$. Respective points $6a$ and $6b$ at the other end of the cable are connected to a receiver $13a$ and termination $12a$. The signal is coupled to the cable by the transmitter $14a$. The signal energy is propagated over the cable and absorbed by the termination $12a$, and received by the receiver $13a$.

The term 'transmitter' herein includes any device which is capable of outputting energy or driving (or exciting) a signal, including an electrical signal, in a transmission-line. Such devices include line-drivers, modems and transceivers, as well as any other device having excitation capability. Such a signal may either be voltage based, current based or a combination of both. Similarly, the term 'receiver' herein includes any device which is able to receive energy/signal (or any function thereof) from a coupled transmission line and convert it to an electrical form, including line receivers, modems and transceivers. Receivers are assumed herein not to include any termination functionality (such as very high input impedance).

A transmission-line is defined as a medium used to carry a signal from a point A to a point B. The terms 'line', 'transmission line', 'cable', 'wiring', 'wire pair' as used herein should be interpreted to include any type of transmission-line, and specifically a metallic transmission line comprising two

2

or more conductors used to carry electrical signals. Non-limiting examples are coaxial cable, PCB connections and twisted pair, the latter including both UTP (unshielded twisted-pair) and STP (shielded twisted-pair), as well as connections within Application Specific Integrated Circuits (ASICs). Characteristics of wired transmission-lines and their effect over digital data transmission are described for example in National Semiconductor Corporation Application Note 806 (April 1992) entitled: "Data Transmission Lines and their Characteristics", and in National Semiconductor Corporation Application Note 808 (March 1992) entitled: "Long Transmission Lines and Data Signal Quality". Characteristic impedance is a primary property of a metallic transmission line, and commonly relates to the instantaneous voltages and currents of waves traveling along the line.

The basic function of the termination $12a$ is to fully absorb the signal/energy propagating in the transmission line. Improper termination such as impedance mismatch will cause reflections (a.k.a ringing, overshoot, undershoot, distortion and resonance) back from the receiver-connected end to the transmitter-connected end. Such reflections will commonly degrade the communication characteristics of the communication link. Proper line termination becomes increasingly important as designs migrate towards higher data signal transfer rates over relatively longer lengths of transmission medium. For example, this may be applied to differential data transmission over two conductors such as twisted pair cable. In general, transmission-lines such as cables are treated as transmission-lines when the component wavelengths of the propagating signal, such as an electrical signal in a cable, is shorter than the physical length of the transmission-line. The importance of a proper line termination is discussed for example in National Semiconductor Corporation Application Note 108 (July 1986) entitled: "Transmission Line Characteristics". A proper line termination typically enables better ability to reliably recover a transmitted signal by using simpler means, as well as improving noise susceptibility.

Analysis of reflections can be found in the National Semiconductor Corporation Application Note 807, (March 1992) entitled: "Reflections: Computations and Waveforms", and the manner in which reflections impact on data transmission systems is described in the National Semiconductor Corporation Application Note 903 (August 1993) entitled: "A Comparison of Differential Termination Techniques".

Generally, in order to avoid reflection, the termination impedance should match the characteristic impedance of the transmission line in the frequency band of the discussed signal. If the cable parameters are known, and in particular its characteristic impedance (commonly designated as Z0), a good practice is to install a termination (a.k.a. terminator) $12a$ of the same value (Z0). In many cases, the cable parameters may be unknown. For example, the cable may exist in a wall and/or be of unknown type. Furthermore, cables may be manufactured with relatively large parameters tolerances, resulting in variations of characteristic impedance from batch to batch. Similarly, the characteristic impedance may change due to environmental conditions such as temperature, humidity and also over time. In any case wherein the cable parameters are not known, a measurement needs to be performed in order to establish the cable characteristic impedance, and accordingly terminating the line. Such measurement requires expertise, is labor extensive and time consuming.

There is thus a widely recognized need for, and it would be highly advantageous to have, a method and system for allowing easy and simple measuring of characteristic impedance, upon which a proper termination of a transmission line may

</div>

**3**

be calculated, for example. Such system may be applied to transmission lines in general, and wired networks in particular, and specifically for a metallic transmission line having an unknown or changing characteristic impedance.

A multi-point based network (a.k.a. bus or multidrop network) is shown as network **10** in FIG. 1a. Two conductors **11a** and **11b** are used as the communication medium, wherein multiple nodes are connected thereto, each node connected at a distinct point along the line. The network is shown in a state wherein node **14a** connected to the two conductors **11a** and **11b** of the line at respective connection points **18a** and **18b** is a transmitter, while all other nodes serve as receivers. Nodes **13a**, **13b** and **13c** serve as receivers and are connected to the line at respective points (**17a**, **17b**), (**19a**, **19b**) and (**9a**, **9b**) respectively. Similar to the above discussion, a termination (equal to the line characteristic impedance) is connected to each end, wherein terminations **12a** and **12b** are respectively connected to the transmission line ends (**15a**, **15b**) and (**16a**, **16b**).

Typically in wired communication, the wiring characteristic impedance is near pure resistance (non-complex impedance); hence each termination could be a simple resistor having a resistance equal to the characteristic impedance. Such resistors **23** are shown as terminations and are connected to the transmission line end points (such as **16a**, **16b**) of network **20** shown in FIG. 2.

While the metallic transmission line **5** shown in FIG. 1 is a non-tapped, single-path, homogenous and continuous wiring, a transmission line may sometimes involves a tap (a.k.a stub, bridge, and bridge-tap) or any other discontinuity. Such medium is shown in FIG. 2 as network **20**. In addition to the two conductors **11a** and **11b**, the network employs an additional wiring part (a tap) comprising two conductors **21a** and **21b**, tapped in connection points **22a** and **22b** respectively. Similar to the above discussion, a termination is required in each line end, hence requiring resistor **23c** connected across the tap end points **24a** and **24b**. Similarly, a wired network may employ multiple such taps. Hence for a line having arbitrary topology such as 'star', 'tree' or any combination thereof, the taps may be without any node connection (such as shown in network **20**), or may have nodes connected thereto. In addition, nodes may be connected to one or more of the line ends, in parallel to the termination.

In a multi-point environment, while termination is essential in all wiring ends in order to reduce reflections, it is equally important not to introduce termination at all points other than the cable ends. Any impedance connected will cause a mismatch and a signal propagated will introduce reflections at that point. As such, the nodes **13a**, **13b** and **13c** should exhibit high impedance in their connection points to the transmission line.

In many cases, nodes (in particular receivers) comprise a built-in termination/resistor. If the node is connected in one of the line ends, the termination should be connected in parallel to the node. However, in a configuration wherein the node is not located in the line ends, the termination should be disconnected or disabled, in order to avoid generation of reflections. Such distinction between the connection locations complicates the network installation. Furthermore, in some cases the wiring topology is not easily known, such as in the case of in-wall existing wiring. Identifying the topology in order to distinguish between line ends and other points may be complex, labor intensive and expensive.

There is thus a widely recognized need for, and it would be highly advantageous to have, a method and system for allowing easy and simple termination of a transmission line in general, and wired networks in particular, and specifically for

**4**

a metallic transmission line having multiple connection points, unknown to be either ends or in the middle of a wiring system.

Wired Home Networking.

Most existing offices and some of the newly built buildings facilitate a data network structure based on dedicated wiring. However, implementing such a network in existing buildings typically requires installation of new wiring infrastructure. Such installation of new wiring may be impractical, expensive and problematic. As a result, many technologies (referred to as "no new wires" technologies) have been proposed in order to facilitate a LAN in a building without adding new wiring. Some of these techniques use existing utility wiring installed primarily for other purposes such as telephone, electricity, cable television (CATV), and so forth. Such an approach offers the advantage of being able to install such systems and networks without the additional and often substantial cost of installing separate wiring within the building.

The technical aspect for allowing the wiring to carry both the service (such as telephony, electricity and CATV) and the data communication signal commonly involves using FDM technique (Frequency Division Multiplexing). In such configuration, the service signal and the data communication signals are carried across the respective utility wiring each using a distinct frequency spectrum band. The concept of FDM is known in the art, and provides means of splitting the bandwidth carried by a medium such as wiring. In the case of telephone wiring carrying both telephony and data communication signals, the frequency spectrum is split into a low-frequency band capable of carrying an analog telephony signal and a high-frequency band capable of carrying data communication or other signals.

A network in a house based on using powerline-based home network is also known in the art. The medium for networking is the in-house power lines, which is used for carrying both the mains power and the data communication signals. A PLC (Power Line Carrier) modem converts a data communication signal (such as Ethernet IEEE802.3) to a signal which can be carried over the power lines, without affecting and being affected by the power signal available over those wires. A consortium named HomePlug Powerline Alliance, Inc. of San Ramon, Calif. USA is active in standardizing powerline technologies. A powerline communication system is described in U.S. Pat. No. 6,243,571 to Bullock et al., which also provides a comprehensive list of prior art publications referring to powerline technology and application. An example of such PLC modem housed as a snap-on module is HomePlug1.0 based Ethernet-to-Powerline Bridge model DHP-100 from D-Link® Systems, Inc. of Irvine, Calif., USA. Outlets with built in PLC modems for use with combined data and power using powerlines are described in US Patent Application 2003/0062990 to Schaeffer et al entitled '*Powerline bridge apparatus*'. Such power outlets are available as part of PlugLAN™ by Asoka USA Corporation of San Carlos, Calif. USA.

Similarly, carrying data over existing in home CATV coaxial cabling is also known in the art, for example in US Patent application 2002/0166124 to Gurantz et al. An example of home networking over CATV coaxial cables using outlets is described in US Patent application 2002/0194383 to Cohen et al. Such outlets are available as part of HomeRAN™ system from TMT Ltd. of Jerusalem, Israel.

Telephony Definitions and Background

The term "telephony" herein denotes in general any kind of telephone service, including analog and digital service, such as Integrated Services Digital Network (ISDN).

5

Analog telephony, popularly known as "Plain Old Telephone Service" ("POTS") has been in existence for over 100 years, and is well designed and well engineered for the transmission and switching of voice signals in the 300-3400 Hz portion (or "voice band" or "telephone band") of the audio spectrum. The familiar POTS network supports real-time, low-latency, high-reliability, moderate-fidelity voice telephony, and is capable of establishing a session between two end-points, each using an analog telephone set.

The terms "telephone", "telephone set", and "telephone device" herein denote any apparatus, without limitation, which can connect to a Public Switch Telephone Network ("PSTN"), including apparatus for both analog and digital telephony, non-limiting examples of which are analog telephones, digital telephones, facsimile ("fax") machines, automatic telephone answering machines, voice (a.k.a. dial-up) modems, and data modems.

The terms "data unit", "computer" and "personal computer" ("PC") are used herein interchangeably to include workstations, Personal Digital Assistants (PDA) and other data terminal equipment (DTE) with interfaces for connection to a local area network, as well as any other functional unit of a data station that serves as a data source or a data sink (or both).

In-home telephone service usually employs two or four wires, to which telephone sets are connected via telephone outlets.

Home Networking Existing In-House Wiring.

Similarly to the powerlines and CATV cabling described above, it is often desirable to use existing telephone wiring simultaneously for both telephony and data networking. In this way, establishing a new local area network in a home or other building is simplified, because there is no need to install additional wiring. Using FDM technique to carry video over active residential telephone wiring is disclosed by U.S. Pat. No. 5,010,399 to Goodman et al. and U.S. Pat. No. 5,621,455 to Rogers et al.

Existing products for carrying data digitally over residential telephone wiring concurrently with active telephone service by using FDM commonly uses a technology known as HomePNA (Home Phoneline Networking Alliance) whose phonelines interface has been standardized as ITU-T (ITU Telecommunication Standardization Sector) recommendation G.989.1. The HomePNA technology is described in U.S. Pat. No. 6,069,899 to Foley, U.S. Pat. No. 5,896,443 to Dichter, U.S. Patent application 2002/0019966 to Yagil et al., U.S. Patent application 2003/0139151 to Lifshitz et al. and others. The available bandwidth over the wiring is split into a low-frequency band capable of carrying an analog telephony signal (POTS), and a high-frequency band is allocated for carrying data communication signals. In such FDM based configuration, telephony is not affected, while a data communication capability is provided over existing telephone wiring within a home.

Outlets

The term "outlet" herein denotes an electro-mechanical device, which facilitates easy, rapid connection and disconnection of external devices to and from wiring installed within a building. An outlet commonly has a fixed connection to the wiring, and permits the easy connection of external devices as desired, commonly by means of an integrated standard connector in a faceplate. The outlet is normally mechanically attached to, or mounted in, a wall or similar surface. Non-limiting examples of common outlets include: telephone outlets for connecting telephones and related devices; CATV outlets for connecting television sets, VCR's, and the like; outlets used as part of LAN wiring (a.k.a. structured wiring) and electrical outlets for connecting power to electrical appliances. The term "wall" herein denotes any interior or exterior surface of a building, including, but not limited to, ceilings and floors, in addition to vertical walls.

Functional Outlet Approach.

This approach involves substituting the existing service outlets with 'network' active outlets. Outlets in general (to include LAN structured wiring, electrical power outlets, telephone outlets, and cable television outlets) have evolved as passive devices being part of the wiring system house infrastructure and solely serving the purpose of providing access to the in-wall wiring. However, there is a trend towards embedding active circuitry in the outlet in order to use them as part of the home/office network, and typically to provide a standard data communication interface. In most cases, the circuits added serve the purpose of adding data interface connectivity to the outlet, added to its basic passive connectivity function.

An outlet supporting both telephony and data interfaces for use with telephone wiring is disclosed in U.S. Pat. No. 6,549, 616 entitled 'Telephone outlet for implementing a local area network over telephone lines and a local area network using such outlets' to Binder. Such outlets are available as part of NetHome™ system from SercoNet Ltd. of Ra'ananna, Israel.

Another outlet is described in U.S. Pat. No. 6,216,160 to Dichter, entitled 'Automatically configurable computer network'. An example of home networking over CATV coaxial cables using outlets is described in WO 02/065229 published 22 Aug., 2002 entitled: 'Cableran Networking over Coaxial Cables' to Cohen et al. Such outlets are available as part of HomeRAN™ system from TMT Ltd. of Jerusalem, Israel. Outlets for use in conjunction with wiring carrying telephony, data and entertainment signals are disclosed in US Patent Application US2003/0099228 to Alcock entitled 'Local area and multimedia network using radio frequency and coaxial cable'. Outlets for use with combined data and power using powerlines are described in US Patent Application 2003/0062990 to Schaeffer et al. entitled 'Powerline bridge apparatus'. Such power outlets are available as part of PlugLAN™ by Asoka USA Corporation of San Carlos, Calif. USA.

While the active outlets have been described above with regard to networks formed over wiring used for basic services (e.g. telephone, CATV and power), it will be appreciated that the invention can be equally applied to outlets used in networks using dedicated wiring. In such a case, the outlet circuitry is used to provide additional interfaces to an outlet, beyond the basic service of single data connectivity interface. For example, it may be used to provide multiple data interfaces wherein the wiring supports single such data connection. An example of such outlet is the Network Jack™ product family manufactured by 3Com™ of Santa-Clara, Calif., U.S.A. In addition, such outlets are described in U.S. Pat. No. 6,108,331 to Thompson entitled 'Single Medium Wiring Scheme for Multiple Signal Distribution in Building and Access Port Therefor' as well as U.S. Patent Application US 2003/0112965 Published Jun. 19, 2003 to McNamara et al. entitled 'Active Wall Outlet'.

While the active outlets have been described with regard to outlets and networks based on conductive media such as wires and cables, it will be appreciated that such outlets are equally applicable in the case wherein the network medium is non-conductive, such as fiber-optical cabling. Active outlets supporting data interfaces and based on fiber optic cabling are described in U.S. Patent Application US 2002/0146207 Published Oct., 10 2002 to Chu, entitled 'Fiber Converter Faceplate Outlet', as well as in U.S. Pat. No. 6,108,331 to Thomp-

7

son entitled 'Single Medium Wiring Scheme for Multiple Signal Distribution in Building and Access Port Therefor'. As such, the term 'wiring' as used in this application as well as in the appended claims should be interpreted to include networks based on non-conductive media such as fiber-optics cabling.

While the outlets described above use active circuitry for splitting the data and service signals, passive implementations are also available. An example of such a passive outlet is disclosed in WO 02/25920 to Binder entitled 'Telephone communication system and method over local area network wiring'. Such outlets are available as part of the etherSPLIT system from QLynk Communication Inc. of College Station, Tex. USA. etherSPLIT is a registered trademark of Dynamic Information Systems.

The described above outlets are complete and self-contained devices. As such, they can be easily installed in new houses instead of regular passive simple outlets. However, such solutions are not appropriate in the case of retrofitting existing wiring systems. In most cases, any such modification will require dismantling the existing outlets and installing the new ones having the improved features. Such activity is cumbersome, expensive and will require professional skill. Furthermore, owing to safety aspects involved while handling hazardous voltages (such as in the powerlines and telephone lines), local regulations may require only certified personnel to handle the wiring, making it expensive and militating against a do-it-yourself approach.

Furthermore, as the technology and environment change in time, a need to upgrade, modify or change the outlet functionalities, features and characteristics may arise. For example, the data interface may need to be upgraded to interconnect with new standards. In another example, the circuitry may need to be upgraded to support higher bandwidth. Similarly, management and Quality of Service (QoS) functionalities may need to be either introduced or upgraded. In yet other examples, additional functionalities and interfaces may need to be added. Using complete self-contained outlets as a substitute to the existing ones also introduces the disadvantages described above.

Plug-in Device.

One approach to adding functionality to existing outlets is by using a plug-in module. Such plug-in modules are described in US Patent Application US 2002/0039388 to Smart et al entitled 'High data-rate powerline network system and method', US Patent Application US 2002/0060617 to Walbeck et al. entitled 'Modular power line network adapter' and also in US Patent Application US 2003/0062990 to Schaeffer, J R et al. entitled 'Powerline bridge apparatus'. Such a module using HomePlug™ technology are available from multiple sources such as part of PlugLink™ products by Asoka USA Corporation of San Carlos, Calif., USA. Home-Plug is a trademark of HomePlug Powerline Alliance, Inc. of San Ramon, Calif., USA. Various types of snap-on devices are also described in WO 04/001034.

SUMMARY OF THE INVENTION

According to one aspect of the invention, a transmission line characteristic impedance is measured by applying regular lumped impedance/resistance measuring. Any other lumped or distributed impedance/resistance measuring technique known in the art may be equally applied. In one aspect of the invention the measurement is based on transmitting, sourcing or exciting an electrical signal, either voltage or current (or both). In one aspect of the invention the measurement is based on exciting a known energy into the transmis-

8

sion-line, and measuring the current flow to the transmission line directly or indirectly such as using voltage divider. The measured values are used to calculate the transmission-line characteristic impedance. Measuring the characteristic impedance may be initiated periodically, upon receiving an external electrical signal (e.g. from another system), upon manually applying a signal, or upon powering up, or upon sensing any other signal excitation such as packet or session as part of a data communication session.

In order to allow proper measurement, no other signals (such as reflections or data communication signals) should exist and affect the measurement. According to one aspect of the invention, the impedance (either lumped or distributed) measuring is executed shortly after injecting the measurement signal into the transmission-line, and prior to reflections arrival from taps or non-terminated ends to the measured transmission line end. Since practically transmission-lines are not homogenous and do not have infinite length, reflections from taps, non-homogenous points or non-terminated remote ends occur and will arrive to the measured end. Thus, the measurement should be executed and completed shortly after applying the measurement signal, before the reflections arrive to this line end. In order to make any subsequent use of the measured value, the calculated characteristic impedance (or any function thereof such as the voltage/current measured) should be stored.

According to one aspect of the invention the transmission-line serves as a medium for data communication. In such configuration, a modem (being transmitter, receiver, transceiver or the like) is connected to a point along the transmission-line as well as to the transmission-line end-point relating to the impedance measurement. Characteristic impedance measurement may be used to determine whether a termination is required in a specific connection point. According to one aspect of the invention the termination value is determined according to the measured characteristic impedance. For example, the termination value can be set to be equal to the measured lumped impedance in order to minimize reflection in an end-point. In the case wherein data communication is involved over the same transmission-line, time domain multiplexing is used to allow both the modem and the measurement to share the transmission line, wherein the modem operation should be halted during the impedance measurement, in order not to interfere with the measurement and to enable proper and accurate measurement. According to one aspect of the invention, this is achieved by disconnecting the modem (to include transceiver and transmitter) from the transmission-line during the measurement phase, and re-connecting it after the measurement is completed. As such, the system may be exclusively in either a measurement state or a data communication state.

According to one aspect of the invention, a frequency division multiplexing (FDM) approach is applied in order to concurrently carry both an application signal (such as data communication signal) and an impedance measurement related signal over the transmission-line. In this arrangement, the measurement system uses a signal carried in one or more frequency bands distinct from the band wherein the application signal is carried. The characteristic impedance of the transmission-line in the frequency band or bands not being part of the measurement system may be approximated using known extrapolation or interpolation techniques.

According to one aspect of the invention, the measured/calculated transmission-line characteristic impedance is used for estimating the count of wire pairs connected to a single connection point, for use with one or more similar wire pairs having similar nominal characteristic impedance $Z0$ and all

9                                                        10

connected to the single connection point. By instantaneously measuring the connection point lumped impedance Z, the connected wire pairs count can be estimated to be Z0/Z. The estimated pairs count may be visually indicated to a user as part of a pairs count test-set.

According to one aspect of the invention, the pair count is used to identify the end point of an unknown wiring structure. In the case wherein Z=Z0, a single wire pair connection-point is detected, thus requiring a termination to be connected to this point in order to minimize reflections from this wire-pair end-point.

According to one aspect of the invention in-wall hidden wire-pairs are measured. Such wire pairs may comprise telephone, AC power or CATV wiring infrastructure, as well as any other wiring. The wire pair may be carrying service signals (such as telephone, AC power or CATV signals), and may be accessed via outlets (such as telephone, AC power or CATV outlets). In the case wherein outlets are used to connect to the wiring, the impedance measuring or the termination setting or both circuits may be integrated (in part or in full) into the outlet.

According to one aspect of the invention for use with a transmission-line carrying a signal and having a nominal characteristic impedance and terminated with a impedance-controlled termination, the proper termination value (having the same value as the nominal characteristic impedance) is matched to the transmission-line by using a closed control loop, wherein the power dissipated by the impedance-controlled termination (connected to the transmission-line) is measured and used for changing the impedance-controlled termination value to obtain a maximum power dissipation. The power dissipation by the termination can be measured directly by sensing the voltage across or the current flowing through the termination. Alternatively, the dissipated power is indirectly measured by measuring a physical phenomena affected by the dissipated power (e.g. heat).

The measuring system (in whole or in part) may be enclosed as a stand-alone unit, housed/integrated as part of a modem, or housed in integrated form as part of a service outlet or as a snap-on module. Similarly, the termination setting system (in whole or in part) may be stand-alone, or housed/integrated as part of a modem, or housed in integrated form as part of a service outlet, or as a snap-on module

The above summary is not an exhaustive list of all aspects of the present invention. Indeed, the inventor contemplates that his invention includes all systems and methods that can be practiced from all suitable combinations of the various aspects summarized above, as well as those disclosed in the detailed description below and particularly pointed out in the claims filed with the application. Such combinations have particular advantages not specifically recited in the above summary.

It is understood that other embodiments of the present invention will become readily apparent to those skilled in the art from the following detailed description, wherein are shown and described only embodiments of the invention by way of illustration. As will be realized, the invention is capable of other and different embodiments and its several details are capable of modification in various other respects, all without departing from the scope of the present invention

as defined by the claims. Accordingly, the drawings and detailed description are to be regarded as illustrative in nature and not as restrictive.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention is herein described, by way of non-limiting example only, with reference to the accompanying drawings, wherein like designations denote like elements.

FIG. 1 illustrates schematically a point-to-point network.

FIG. 1a illustrates schematically a multi-point network.

FIG. 2 illustrates schematically a multi-point network with a tap.

FIG. 3 illustrates schematically a general functional block diagram of an exemplary Characteristic Impedance Meter (CIM) according to the invention.

FIG. 4 illustrates schematically a general functional block diagram of an exemplary termination system according to the invention.

FIG. 5 illustrates schematically a general functional block diagram of an exemplary Characteristic Impedance Meter (CIM) according to the invention.

FIG. 6 illustrates schematically a general functional block diagram of an exemplary Voltage controlled Resistor (VCR).

FIG. 7 illustrates schematically a general functional flow chart of an exemplary operation according to the invention.

FIG. 8a illustrates schematically a general termination system.

FIG. 8b illustrates schematically a general functional block diagram of an exemplary termination system according to the invention.

FIG. 9 illustrates schematically a general functional block diagram of an exemplary pairs counting system according to the invention.

FIG. 10 illustrates schematically a frequency bands allocation scheme according to the invention.

FIG. 11 illustrates schematically a general functional block diagram of an exemplary termination system according to the invention.

FIG. 12 illustrates schematically a graph of a dissipated power versus a termination resistance.

FIG. 13 illustrates schematically a telephone-wiring infrastructure in a house.

FIG. 14 illustrates schematically an AC-power wiring infrastructure in a house.

FIG. 15 illustrates schematically an exemplary termination test-set according to the invention.

FIG. 16 illustrates schematically an exemplary AC power wiring termination device according to the invention.

FIG. 17 illustrates schematically a typical packet structure.

FIG. 18 illustrates schematically a general functional block diagram of an exemplary termination system according to the invention.

DESCRIPTION OF EXEMPLARY
EMBODIMENTS

The principles and operation of a network according to the present invention may be understood with reference to the drawings and the accompanying description wherein similar components appearing in different figures are denoted by identical reference numerals. The drawings and descriptions are conceptual only. In actual practice, a single component can implement one or more functions; alternatively, each function can be implemented by a plurality of components and circuits. In the drawings and descriptions, identical ref-

11                                    12

erence numerals indicate those components that are common to different embodiments or configurations.

A part of one embodiment according to the present invention is shown as Characteristic Impedance Meter (CIM) in FIG. 3. The CIM measures the characteristic impedance of a transmission line by applying a signal to the line, and directly measuring the input impedance into the transmission line by means of voltage division shortly afterwards. The CIM 30 measures the characteristic impedance of the Transmission line Under Test (T.U.T or TUT) 42 connected via port 39, and having an unknown characteristic impedance Z0. The measurement sequence starts upon sensing a MEASURE signal in port 31, signaling the CIM to start the measurement process. The MEASURE signal at port 31 is fed to pulse generator 32, which outputs a pulse shown as square wave pulse signal 33. The pulse signal waveform 33 starts at time T0, is τ seconds long and has an amplitude of V' volts. In the case wherein the characteristic impedance is required to be measured in a specific and/or limited frequency band, the pulse signal is then fed to a band-pass filter 34 limiting the signal energy to the required band. If the signal is generated having the frequency spectrum required, and/or if no frequency band limitations exists, such filter 34 may be omitted. After being filtered by the filter 34, the pulse is connected to the TUT 42 via the series resistor Rs 36 connected to the port 39. The processing unit 37 is considered to have very high input impedance, hence does not interfere with the signal. The voltage at port 39 (and at the input to the processing unit 37) is as such a voltage formed by dividing V' between the resistor Rs and Z0 (pure resistive characteristic impedance is assumed). As such, the divided voltage Vd at port 39 is: Vd=V'*Z0/(Rs+Z0), assuming no attenuation by the filter 34. In the case of amplitude attenuation by the filter 34, the voltage V' reflects the amplitude at the filter 34 output. Since V' and Rs are known, the voltage Vd at port 39 is a direct function of the value of the characteristic impedance Z0. In order to allow for accurate measurement, the value of resistor Rs should be as close as possible, or at least of the same order of magnitude, as the measured impedance Z0. The voltage Vd is fed to the processing unit 37, which provides a signal output which is a function of the voltage at port 39. For example, the processing unit 37 may provide a voltage proportional to the Vd above. In another example, the processing unit 37 calculates Z0 by the equation Z0=Rs*Vd/(V'−Vd), and provides a signal (e.g. voltage) proportional to the Z0 calculated. Other transfer functions may also be considered. If processing is not required, processing unit 37 may be omitted. Assuming a practical and finite length TUT, the pulse signal starts to propagate along the transmission line, and assuming taps, non-terminated ends or any other non-continuities, a reflection signal will appear at port 39, causing the measured Vd to be inaccurate and not to reflect the actual voltage division discussed. As such, an accurate value of Vd exists at port 39 only for a short period after the pulse signal start (T0). Hence, there is a need to latch and store the value at this instant.

The pulse signal 33 is also provided to unit 35. After a predetermined delay period (after T0), a signal is output to the trigger input of a sample and hold unit 38, which latches and holds the signal output from processing unit 37 as signal Vm at port 41. Hence, signal Vm (e.g. voltage) represents a function of the TUT characteristic impedance Z0. The delay value should not be too short, in order to allow an accurate and fully stabilized value. On the other hand, the delay value should not be too long in order to obviate the effect of reflections. The value of τ should be small enough in order not to occupy the transmission line for long and to minimize the period required for the measurement. Similarly, the value of τ

should be long enough to allow accurate and stabilize measurement. In a system that has been built and tested, a pulse of τ=15 nanoseconds enabled accurate reflection-free measurement of any twisted-pair cable longer than 70 centimeters.

Hence, a known while after a MEASURE signal is sensed in port 31, the CIM will output in port 41 a signal which represents the value of the characteristic impedance Z0 of the TUT 42 connected in port 39.

The CIM 30 above is operative to measure the characteristic impedance of the TUT 42. After such measurement is performed, adequate termination should be provided based on the measured value. A system 40 providing both measurement and setting of the required termination value is shown in FIG. 4. The TUT 42 shown in the figure is connected via a switch 44, having two distinct states, designated as M (Measurement) and S (Setting), the states being selected by a control signal line SELECT 49. In measurement (M) state, the TUT 42 is connected to the CIM 30 port 39, as described in FIG. 3 above. In such a state, upon application of a MEASURE signal to port 31 of the CIM 30, the CIM 30 will perform the measurement function, resulting in a continuous Vm signal representing the measured characteristic impedance Z0 value. The Vm signal at port 41 of the CIM 30 drives the Termination Setting (TS) unit 43. The TS 43 functions to exhibit the required termination value. Typically, an impedance value equal to the measured characteristic impedance Z0 will be used for termination, in order to minimize mismatch and reflections. At the end of the measurement period, line SELECT control 49 of switch 44 shifts to S (Setting) mode. The TUT 42 is thus disconnected from the CIM 30 and connects to the TS via line 45, resulting in a correct termination value at the end of the TUT 42, whereby the TUT is operative to be used as a communication medium terminated by unit 43.

As described above, the characteristic impedance is measured using lumped impedance measuring technique, thus treating the transmission-line as lumped entity rather than a distributed one. Such approach is valid under one or more of the following assumptions:

a. No energy (other than the signal used for impedance measuring) is being transmitted over the transmission line and received by the measuring device during the measurement cycle. As such, the measurement is solely based on the energy transmitted to the transmission-line by the measuring device, having a known value. Other energy received may impact on the accuracy of the impedance measurement.

b. Infinite length transmission line. In a very long and homogenous transmission line (e.g. having no taps/ bridges and no impedance changes along the line) no reflections are generated, thus no signal interferes with the impedance measurement.

c. The measurement is executed before reflections are received in the connected end. In this scenario, it is assumed that at least a short length of the transmission line at the end used for the measurement is homogenous (e.g. no taps or impedance change), hence causing no reflections. The time interval until any reflections or any other interfering signals reach the end used for measurement is used for completing the impedance measurement, thus gaining accurate no-reflection affected measuring cycle. For example, assuming the nearest interfering point (e.g. line end point or tap) is at a point having a distance X from the measuring end, and assuming the signal propagation speed over the transmission line is V (usually close to the speed of light), this point will generate a reflection signal (as a result of the trans-

US 7,521,943 B2

13

14

mitted measurement signal) that will reach the transmission line end after a time delay of 2*X/V. During this time, an accurate interference-free measurement may be executed.

Under the above conditions a lumped impedance measurement will provide the transmission-line characteristic impedance. Any lumped impedance or resistance measurement mechanism may be used. In most cases, Ohm's law is used as the basis of such measurement. One example is shown in the CIM 30, wherein voltage excitation is applied to the TUT, and the current flowing is measured by the voltage created over a voltage divider resistor network. However, any other lumped impedance or resistance measurement mechanism may be equally used. Such an example is CIM 50 illustrated in FIG. 5. CIM 50 is based on CIM 30 structure, however the characteristic impedance lump measurement is based on directly measuring the current I flowing through the TUT 42 by an ammeter (a.k.a. amperemeter) 82 and the voltage V across the TUT by a voltmeter 85. The processing unit 37 calculates the characteristic impedance by using Ohm's law R=V/I. In both cases of CIM 30 and CIM 50, either current or voltage excitation may be used, as well as a combination of both current and voltage excitation.

While the invention has been demonstrated with a few Ohm's law impedance/resistance measurement examples, it will be appreciated that the invention can equally be applied to any other impedance or resistance lumped measurement. Furthermore, any non-lumped measurement based on lumped or non-lumped transmission-line electrical parameters may equally be used. Furthermore, the impedance may be measured based on any transmission-line physical parameters other than electrical parameters.

In one embodiment according to the present invention the Termination Setting (TS) 43 is based on a Voltage Controlled Resistor (VCR). An implementation of such VCR is known in the art, and a non-limiting example will be based on Xicor X9015 Single Digitally Controlled Potentiometer (XDCP™), available from Intersil Corporations of Milpitas, Calif. U.S.A.

The Termination Setting (TS) described above has a continuous setting range for the termination value. Similarly, the TS may be operative to select from a fixed set of predetermined values. Such a Termination Setting (TS) 60 is shown in FIG. 6, having two discrete values, infinity and Rts. A comparator 51 compares the incoming voltage Vm to a predetermined value. In the case wherein the Vm is above the set threshold, a signal is sent to the Switch Driver 52, which in turn operates, via a control line 55, a switch 54, which in turn connects the resistor Rts 53 to the TUT via port 45. In the case wherein the value of Vm does not cross the threshold, the switch 54 remains in the open state, resulting in a non-connected termination to the line 45, effectively an infinite resistance value. Similarly, multiple non-infinite values can be switched in as a function of the Vm input value. Switch 54 may be implemented by relay contacts, wherein line 55 is the coil operating signal or may be implemented using solid state circuitry as known in the art.

TS 60 may be used in order to decide whether a termination should be inserted or not. In the case of wiring having multiple connection points and unknown topology, there is a need to identify the wiring ends in order to connect a termination thereto, and to identify points that are not ends (referred to as non end connection points) and must be left open. An example may be the wiring 11 of system 20, having end points 15, 16 and 24, as well as non end connection points 17, 18, 19 and 9 (it is assumed that terminations 23a, 23b and 23c are not connected). Applying CIM 30 at an end point (such as 15, 16

and 24) will result in a Vm value representing the wiring 11 characteristic impedance value. Similarly, applying the CIM 30 to a non end connection point, will result in a Vm value of half of the characteristic impedance value, since each wiring segment connected represents its own characteristic impedance value, thus resulting in two identical values connected in parallel. In the case of a tap, such as connection point 22 in wiring 11 in system 20, wherein three branches are effectively connected, the equivalent value measured by the CIM 30 will be a third of the characteristic impedance. Since only the end-points are to be equipped with a termination, a TS 60 with a comparator 51 having a threshold equal, for example, to 0.75 of the nominal characteristic value may be used. End-points will be identified as above the threshold level, and hence will result in connection of the characteristic impedance resistor Rts 53, while non end-point connections will be automatically left open.

Process Flow.

The operations of the process involving automatic termination system are shown as flow chart 70 in FIG. 7. Starting from the Start operation 71, the TUT is disconnected in operation 72 from the modem, for example, and connects in operation 73 to a CIM. The CIM transmits energy for a short while into the TUT (in operation 74), and measures a voltage (or any other parameter) based on the TUT characteristic impedance (operation 75). The value measured which represents the TUT characteristic value is stored in operation 76. After the measuring is completed, the TUT is disconnected from the CIM (operation 77) and reconnected to a normal state of communication operation. Based on the measured value in operation 75, the required termination value (e.g. resistor value equal to the characteristic impedance) is calculated (operation 78) and connected to the TUT. In the example of system 40 above, operations 77, 78 and 79 can be carried out with the aid of TS 43 and switch 44.

While the above process may be employed only once in the system lifetime, such as only as part of the initial installation, in some embodiments the process may be repeated more than once. For example, the process may be repeated every time the system is being powered or periodically. In the latter cases, the process will be re-initiated after a delay, as described as operation 69.

As shown in the chart 70, the system may be in one of two states. The first state is the measuring state, comprising operations 72 to 78, during which the TUT parameters are measured, and the regular operation state (comprising operation 79) in which the proper termination is connected and the system operates as a wired communication system. During the regular operation state, the system uses a termination based on the measurement result of the measuring state. As such, a value representing the characteristic termination (or any function thereof) must be calculated and stored in the measuring state, to be used in the regular operation state. Such storing may use mechanical storage (such as a multi-state mechanical switch), analog value storing (such as 'sample and hold' circuitry) or digital memory.

Reflections Computations.

Computations of the voltage and current involving the boundary conditions of a transmission line are known in the art, as exampled and detailed in National Semiconductors Application Note 807 (AN-807) dated March 1992. Calculations will be presented based on assuming a two conductor transmission line consisting of conductors 11a and 11b, having R0, a pure resistive characteristic impedance, and terminated at one end (points 81a, 81b) by a termination resistor 23d having resistance R1, as shown in system 80a shown in FIG. 8a. A signal having a voltage value of Vx and current

15

value of Ix is propagated in the transmission line (from 'left' to 'right'). By definition, the equation $Vx=R0*Ix$ applies, and the energy propagated is equal to $Px=Ix*Vx=VX^2/R0$, and for simplicity's sake, no energy loss in the transmission line is assumed. Part of the propagated energy is absorbed in the termination resistor $23d$, resulting in a voltage level of V1 and current of I1, related by $V1=I1*R1$. In the case of matched termination (R1=R0), all the propagating energy will be absorbed by the termination resistor $23d$, and no reflections will be generated. In the case wherein there is no matching termination, a reflection signal having a voltage of Vr and current value of Ir will be propagated from the end point (from 'right' to 'left'), wherein $Vr=Ir*R0$ applies. Applying Kirchhoff's law to the end point ($81a$, $81b$), the current equation is $I1-Ix=Ir$ and the voltage equation is $V1=Vx+Vr$. Similarly, applying the principle of energy conservation, $Px=P1+Pr$.

Manipulating the above equations results in that $P1=4*R1*Vx^2/[Ro+R1]^2]$. This function is shown schematically as graph $120$ in FIG. 12, wherein the X-axis $123$ represents the R1 value and the Y-axis $122$ represents the resulting P1. The curve $121$ represents the above value of P1 as a function of the parameter R1. Further calculations show that this P1 function has a single maximum at R1=R0, shown as line $124$ in graph $120$, wherein the transmission line is fully matched, and the whole Px energy is absorbed in the termination (P1=Px), and no reflections are generated (Pr=0).

The above calculations suggest that tuning the termination value R1 to obtain the maximum energy dissipation over this terminating resistor, will effectively result in a well-matched termination. One option is to manually tune the termination resistance value (while energy is carried in the transmission line) while measuring the energy absorbed therein, and fixing the steady-state value to the value resulting in the maximum energy.

Alternatively, the termination value may be automatically tuned to match the characteristic impedance by maximizing the power absorption in the termination. Such a system $80b$ is illustrated in FIG. $8b$. A tunable termination $83$, such as a VCR (Voltage Controlled Resistor) is connected to the end points $81a$, $81b$ of a line ($11a$, $11b$), being energized by a driver $14a$. The current flowing through the termination $83$ is measured by a current-meter (ammeter) $82$, while the voltage across the termination $83$ terminals is measured by a voltage-meter (voltmeter) $85$. The metered current and voltage values are multiplied in the multiplier $86$, resulting in a signal which represent the power dissipating in the termination $83$ ($P=I*R$). Similarly, only the current may be measured, and the power calculated by $P=I^2*R$, or alternatively only the voltage may be measured, using the equation $P=V^2/R$ to obtain the power. In yet another embodiment, the power is measured not directly by measuring voltage or current, but rather by the effective power dissipated. For example, assuming that the power is converted into heat, temperature may be measured as an indication of the dissipated power.

The power representing signal is fed from multiplier $86$ via line $88$ to a control unit $87$, which in turn controls the termination $83$ resistance value via line $89$. The control unit $87$ is operative to effect a closed loop to set the resistance value of the VCR $83$ to obtain the maximum power indication on line $88$.

One advantage of system $80b$ is that no dedicated power signal is required to be transmitted into the measurement line as part of the measurement process, but the system rather uses existing energy in the transmission line (for example, as part of normal operation). However, in many cases, proper operation of the system $80b$ requires a minimum received energy in the termination $83$. In one embodiment, a comparator $84$

16

senses the voltage level (as an indicator of the received power level), and allows the operation of the connected control unit $87$ only upon sensing a signal level above a predefined level, ensuring proper loop operation.

Similar to the above discussion, the control loop in system $80b$ may be operated once (e.g. as part of the initial installation, upon manual intervention or as part of any power-on process), periodically or continuously.

System $80b$ has been so far described with regard to matching a proper termination value to the end point of a transmission line. In the case wherein the system in connected to a non end point, such as connection points $9$, $17$ and $18$ in system $20$ in FIG. $2$, part of the 'hitting' energy Px continues to propagate along the transmission line. Applying similar computations as above results in such a case in an absorbed energy of $P1=2.25*R1*Vx^2/[Ro+R1/2)^2]$. Further calculations show that this P1 function has a single maximum at R1=2*R0. Similarly, N connected lines will result in maximum absorbed energy when R1=N*R0. Hence, such mechanism may be used for pairs counting or as an end-point detector as explained below. Since for best operation of a communication system no termination should be applied to non end-points, any measured value indicating a tap rather than an end-point (e.g. maximum effected when R1 is more than $1.5*R0$) should result in disconnection of the termination used for the measurement purposes.

Pairs Counting.

The characteristic impedance measuring may be used as an indicator for identifying a topology of hidden wiring. Such application is shown as system $90$ in FIG. 9. A wiring system $92$ comprises unknown N-counted distinct pairs designated $91a$, $91b$ up to $91c$, each assumed to have the same characteristic impedance value Rt, and all being connected to a common connection point $93$. A CIM $30$ is connected to the connection point $93$, similar to TUT connection. Since the characteristic impedances of all wirings $91$ are connected in parallel, the equivalent impedance measured in point $93$ is equal to Rt/N. Hence, by measuring the characteristic impedance value (represented by voltage Vm), the pair count may be inferred. For example, in the case of five equal cables each having a characteristic impedance of 100 ohms, the equivalent value measured by the CIM $30$ will be 100/5=20 ohms. Such mechanism may also be applied in order to identify end-points in the case of hidden wire topology, since such points reflect the full characteristic value Rt.

Frequency Division Multiplexing (FDM).

System $40$ described above is based on transmitting a signal into the transmission line over the same frequency spectrum used for the communication operation. As such, measures need to be taken in order to avoid collisions with the communication signal. Such measures may be complicated and also limits either the availability to operate the measurement system or the communication network over the transmission line. In one or more embodiments, a frequency division/domain multiplexing (FDM) mechanism is employed, wherein the communication signal is carried over a frequency band distinct from that used by the termination measurement system. An example of a frequency spectrum allocation $100$ is shown in FIG. 10, illustrated along frequency axis $101$. The communication system may use the frequency band $103$ allocated between frequencies f1 and f2. The frequency allocation for the automatic termination system uses the band $102$ above frequency f2.

A system $110$ utilizing the above FDM concept is shown in FIG. 11. The communication system is based on a modem $113$ transmitting/receiving signals to/from the transmission line $42$ through a Band Pass Filter (BPF) $112$, passing only

17 18

signals in the frequency band 103. The termination 43 is also connected to the transmission line 42 via the BPF 112. The automatic termination system is based on CIM 30, connected to the transmission line 42 via a Band Pass Filter (BPF) 111, passing only the termination system related signals residing in the band 102 (above frequency f2). In the frequency allocation 100 shown in FIG. 10, BPF 111 may be implemented as a High Pass Filter (HPF) and BPF 112 may be implemented as a Low Pass filter (LPF).

Working in different and non-overlapping frequency bands, both the communication and the automatic termination systems can concurrently operate, both coupled to the same transmission line. Since the termination value obtained by the automatic termination system (comprising the CIM 30 and the TS 43) relates to a frequency spectrum distinct from the frequency band used by the communication system, there may be a need to adjust the measured value in order to adapt from the measurement band to the communication band. Such adjustments may use known formulas, a pre-determined scaling or any other adaptation, extrapolation or approximation mechanisms.

While the above description involved the case wherein the automatic termination system used a frequency band above the communication system frequency band, other frequency band allocations may be used. For example, the termination system may use the frequency band 104 as part of the allocation 100, located below the communication system frequency band. In such a scenario, the BPF 112 may be implemented by an HPF (passing signals over frequency f1), and BPF 111 may be implemented by a LPF passing signals under frequency f1.

Furthermore, the measurement system may use bands both below and above the communication system band. The measurements in the two bands may be performed simultaneously (e.g. by two independent CIMs), or be performed using a single CIM 30 and two distinct filters, each operative at a different time. Calculation of the termination value may use both measurements (low and high bands), such as interpolation based on the two readings (e.g. averaging).

Investigating Hidden Wirings

One application of the invention involves investigating an unknown and not-easily accessed wiring infrastructure. An existing telephone wiring in a building is one example. Such existing telephone wiring is hidden in the walls of a house, and a lot of effort is required to expose the topology of the wiring. An example of such existing telephone wiring structure is shown in FIG. 13 as system 130, involving telephone wiring infrastructure within the walls of a building 132. The in-house telephone wiring connects to the PSTN (Public Switching Telephone Network) 131 via one or more telephone wire pairs, commonly referred to as the 'local loop' or 'subscriber loop'. The telephone wiring is accessed in the house via telephone outlets 134a, 134b, 134c and 134d. Each such outlet 134 connects to the in wall wiring, and allows for connection thereto via a front connector 135 (commonly RJ-11 jack in North America), suitable for connection of a telephone set by a suitable plug (RJ-11 plug in North America). As shown for system 130, RJ-11 jacks 135a, 135b, 135c and 135d are respectively part of outlets 134a, 134b, 134c and 134d. In most cases, the telephone jack is part of a faceplate which is secured to an in-wall structure via screws 136aa and 136ab, corresponding screws not shown in the figure being applicable to all other outlets. Telephone wiring segment 133a connects the external local-loop (typically via an external connection box) to the outlet 134a. Telephone wiring 133b connects outlets 134a and 134b, and as such RJ-11 jack is actually a connection point for wiring segments 133a and 133b. Similarly, wiring segment 133c connects outlets 134b and 134c, and wiring segment 133d connects outlets 134b and 134d. Thus, outlet 134b serves as a connection point for the three segments 133b, 133c and 133d.

In many cases it is beneficial to explore the wiring topology in the house. For example, in the case wherein the telephone wiring is used for data communication (such as HomePNA mentioned above), knowing the topology enables installing proper terminations to the wires, hence reducing reflections and improving the communication characteristics. However, since the telephone wires are hidden in the walls of the house, there is no simple and direct way to know the wiring topology in the building. Dismantling the outlets from the walls to investigate the hidden wiring topology is cumbersome, time-consuming, expensive and will most likely require a professional worker (e.g. electrician, telephone technician). Using the CIM offers an easy and quick way of investigating the topology, using the pairs count method described above. For example, it is assumed that the telephone wire-pair characteristic impedance (in the bandwidth measured) is about 120 ohms. Connecting the CIM to outlet 134a (direct connection to RJ-11 jack 135a) will result in a measured impedance of 120/2=60 ohms, since the two wiring segments 133a and 133b are connected thereto. Similarly, connecting to jack 135b of outlet 134b will measure 120/3=40 ohms, due to the three connected segments 133b, 133d, and 133c. Similarly, outlets 134d and 134c will result in 120 ohms, since a single segment is connected thereto (120/1=120). Thus, the CIM can provide the data about the number of wiring segments connected to a specific outlet. In the above example, a set of measurements in all the house outlets will clearly indicate that only outlets 134d and 134c are connected to a single wiring segment, and as such are the only ones requiring termination.

In addition to topology finding, the CIM may also be used to measure the actual characteristic impedance of any hidden wiring segments, such as the in-wall telephone-wiring infrastructure 130. By connecting for example to the connector 135c of outlet 134c (known to be connected to a single wiring segment), the CIM can be used to measure the characteristic impedance of the wiring segment 133c connected thereto, thus allowing for adapting a proper termination value.

While the invention has been described with regard to telephone wiring, it will be appreciated that the same problem and benefits applies to electrical wiring within a building, used for distributing AC power in the house (115 VAC 60 Hz in North America and 220 VAC/50 Hz in Europe, for example). An example of such existing telephone wiring structure is shown in FIG. 14 as system 140, involving AC power wiring infrastructure within the walls of a building 132. The in-house AC power wiring connects to the external power distribution system 141 (typically via the nearest transformer) via a single (or more) AC power wire pair (typically third conductor is ground or earth potential) connected to a junction box 147a, serving as a 'demarcation-point'. The AC power wiring is accessed in the house via AC power outlets 144a, 144b, 144c and 144d. Each such outlet 144 connects to the in wall wiring, and allows for connection thereto via a front connector 145, commonly a receptacle/jack having two or three female connectors, suitable for connection of an appliance via respective prongs a suitable AC power plug. As shown for system 140, AC power jacks 145a, 145b, 145c and 145d are respectively part of outlets 144a, 144b, 144c and 144d. In most cases, the AC power receptacle is part of a faceplate which is secured to an in-wall structure via screws 146aa and 146ab, corresponding screws not shown in the figure being applicable to all other outlets as well. Unlike the

19

telephone wiring structure shown as system **130** above, AC power wiring commonly uses junction boxes for multiple AC power wiring segment connections, such as junction box **147***b*. AC Power wiring segment **143***a* connects the junction box **147***a* to the outlet **144***a*. AC power wiring **143***b* connects outlet **144***a* and junction box **147***b*. Similarly, wiring segments **143***c* and **143***e* respectively connect outlets **144***c* and **144***b* to junction box **147***b*, and wiring segment **143***d* connects outlet **144***d* to junction box **147***a*. Thus, outlet **144***a* serves as a connection point for the two segments **143***a* and **143***b*. In a similar way to the above data communication over telephone wiring, such AC power wiring may be used for data communication concurrently with the AC power distribution functionality (e.g. using HomePlug standard). In such a system, the CIM can be used (by connecting to the relevant AC connector **145** of a tested outlet **144**) to determine which AC power outlets are located at the end of a wire such as outlets **144***b*, **144***c* and **144***d* (and should be thus well terminated) and which outlets (such as outlet **144***a*) should not be terminated since it is not a communication end point. In addition, the CIM may be used to measure the characteristic impedance of an AC power segment thus enabling the installation of a proper termination wherever required.

While the invention has been demonstrated with regard to telephone and AC power wiring, it will be appreciated that the invention can equally be applied to any hidden wiring such as in-wall residential wiring, and specifically to CATV wiring. CATV wiring is used to distribute CATV and data signals throughout the house, and is based on coaxial-cable medium and CATV outlets having RF connectors such as BNC and F-Type. Likewise, the invention will find application where wiring is partially hidden and/or where it is routed in such manner (for example via several mutually adjacent rooms or floors) such that even if the wiring is visible, its topology is not readily discernible. Thus, the term "in-wall" when used in the description and appended claims encompasses also such applications.

In the above in-wall wiring applications for service wiring, comprising CATV, AC power or telephone wiring, the method **70** step **72** comprises connecting to the in-wall wiring, typically via the telephone connector **135** of the telephone outlet **134** in the telephone wiring application, or via the AC power connector **145** in the AC power outlet **144** in the AC power application, or via the RF connector that is part of a CATV outlet. Similarly, operation **77** involving CIM disconnecting comprises disconnecting from the connector in the outlet.

Housing/Packaging

The CIM **30** described above, with or without the termination setting mechanism shown a system **40**, as well as system **80***b*, may be housed and/or integrated within an enclosure (in part of in full) as warranted by the application. In some embodiments, the CIM will be housed as a distinct, separately packaged and stand-alone device. Such an exemplary device **150** used as a handheld test-set device for testing the number of connected wiring segments and the characteristic impedance of a telephone wiring system in a residential house, as described above regarding wiring system **130**, is shown in FIG. **15**. The device **150** connects to the telephone outlet **134** RJ-11 jack connector **135** by a RJ-11 plug **151**, and upon operation shows the measured characteristic impedance in ohms in the numeric display **153**. Similarly, a pairs count may be measured as per the above described method, and the count of the pairs is displayed by light in the appropriate visual indicators (such as LEDs), wherein indicators **152***a*, **152***b*, **152***c* and **152***d* respectively represent 1, 2, 3 and 4 pairs counting.

20

In other embodiments, the CIM **30** (with or without a termination setting such as system **40**), as well as system **80***b*, is not separated but rather integrated with the modem or transceiver used for data communication over the wiring or the transmission-line. In such a case, the housing comprising the modem will be also used to house the CIM and its related and associated components.

Similar to the above discussion regarding housing of modems operative to carry data over active service wiring (to include telephone, AC power and CATV), the CIM related circuitry may be embedded (in part or in full) in an outlet (with or without a respective modem) or in a module mechanically and electrically attachable/detachable to a service outlet (to include telephone, AC power and CATV outlets). An example of such an outlet snap-on module for use with AC power outlet in North America is shown as module **160** in FIG. **16**. The module **160** is mechanically attachable and electrically connectable to an AC power outlet **144** (as shown in FIG. **14**) by two power prongs **161***a* and **161***b*, to be inserted into the respective female connectors of the AC power jack **145**. Module **160** is shown to comprise a power-line modem (such as HomePlug based modem) allowing data units connected via IEEE802.3 10/100BaseT RJ-45 jack **162** to communicate over the AC power medium. Such module **160** typically comprises one or more visual indicators such as **163***a* shown, in order to report the system status to the user.

Operation Modes.

Various operating timing modes may be used involving characteristic impedance measuring.

Continuous mode: In such embodiment the characteristic impedance is continuously measured. Such operation is obtained by activating the 'Delay' **69** in the operational sequence **70**. As such, upon completing a measurement sequence, the sequence re-starts from operation **72** or operation **74**, causing another pulse to be transmitted and measured. In the case wherein no reflections are expected (e.g. long transmission line or well terminated line), the delay may be a minimum or even zero. In the case wherein reflections may occur, the delay should be calculated such that no reflections will be sensed upon the measuring operation **75**. Similarly, continuous operation may use periodic operation, wherein the system is activated at fixed (or variable) intervals, based on the delay incurred in operation **69**. In the case wherein the transmission line is also used for data communication, care should be taken that the pulse transmitted for the characteristic impedance measurement will not interfere with the data communication system operation. If the system is used solely for measurement (e.g. as test set) such as for pairs counting, such precautions are not required. It should be noted that measuring/setting termination value system **80***b* can also work continuously (or periodically), without affecting the data communication operation.

In continuous mode of operation, setting of termination value may also be continuous, wherein the set value tracks the continuous or periodic measured characteristic impedance, or alternatively may be set upon measuring a more than threshold change, or upon external control command.

One-time operation mode: In such embodiment the operational sequence **70** shown in FIG. **7** is operated once, and resumes its non-operational state after sequence completion. In such mode, the need for operation **69** is obviated. The 'start' operation **71** initializing the process may be operated automatically or upon external control (outside the CIM unit) request. In one embodiment, initialization of the measurement is initiated upon powering up the unit. In another embodiment, the modem may initiate measuring (and setting

21                                                              22

of the termination value) at every communication session initialization. In yet another embodiment, the system will commence operation upon manual request (e.g. button push) by a user. Similarly applying for system 80b, the loop operation will be allowed only once for a short period, and the set value will be locked afterwards.

Packet-based operation: While the invention has been demonstrated with regard to CIM 30 generating a specific dedicated pulse only for the purpose of the characteristic impedance measurement, it will be appreciated that the invention can equally be applied to the case wherein the energy used for the measurement is part of a modem regular data communication operation. Particularly, in packet- or burst-based communication, wherein a transmitter is not continuously transmitting but rather intermittently, the packet transmitted can serve also for the purpose of measuring the characteristic impedance. Typically packets used in the art, such as IEEE802.3, comprise four parts (commonly referred to as fields), illustrated as packet 170 as shown in FIG. 17. The first transmitted part is a preamble 171, used for synchronization and receiver training, followed by a header field 172 comprising overhead and management information such as an address. The actual data 173 is next transmitted, followed by a trailer field 174 (comprising checksum, for example). Soon after the packet start, the measurement can be executed, based on the energy transmitted as part of the preamble, for example, as shown in timing line 175. In such a configuration, a measurement may be performed based on the packets timing. For example, operation may be initiated upon each packet sent or every multiple packet set.

Setting of termination value, if required, may also be continuous, one-time or packet-based. In each case, the set value may track the continuous, periodic or one-time measured characteristic impedance, or alternatively may be set upon measuring a more than threshold change, or upon external control command.

An example of implementation guidelines is shown as system 180 in FIG. 18. A CIM 30 is shown, wherein operation is initiated by coupling a pulse to input 31 ('Measure'). A pulse generator 184, such as based on the 555 family of integrated circuit timers known in the art, may be connected to the 'measure' port 31, repetitively and periodically sending pulses to the CIM 30, implementing a continuous and/or periodic mode of operation. Alternatively, there is provided a power-up circuit comprising a resistor 181, a capacitor 182 and an inverting gate 185 (preferably having Schmitt-trigger function) such as 74HC14. Before power-up, capacitor 182 is discharged. Upon powering the circuit, capacitor 182 is charged, causing the gate 185 output to generate a short 'Measure' pulse, thus initiating a onetime operation upon each system powering-up. Furthermore, manual initiation may be added by connecting a switch button 183 in parallel to the capacitor 182. Upon switch 183 contacts closing, the capacitor is discharged and a 'Measure' pulse is regenerated.

While the invention has been demonstrated with various operation modes such as continuous, periodic, manually, one-time and per-packet operations, it will be appreciated that the invention can equally be applied to any combination of the above modes. For example, a system may be initiated upon power-on and then periodically or communication session-timed. Furthermore, the system may shift from mode to mode during operation upon external control.

For many applications involving digital data communication, the characteristic impedance of a line may be practically regarded as having a pure resistance. While the invention has been demonstrated above relating to a pure-resistance based termination, it will be appreciated that the invention can equally be applied to any type of termination, including a termination comprising a complex impedance, using the embodiment of FIG. 5, for example. Furthermore, both linear and non-linear terminations may be considered. Furthermore, while the invention has been demonstrated above relating to matching a termination value to the characteristic impedance of a line in order to reduce reflections, it will be appreciated that the invention can equally be applied to any application wherein a matching termination is not deployed. In these applications, the measured characteristic impedance value may be used as a basis to the termination value to install, thus enabling the control of the mismatch and the level of generated reflections, instead of trying to eliminate them altogether. For example, slight mis-match may be used in digital data transmission in order to improve the rise/fall time of the signal.

While the invention has been demonstrated above relating to a parallel termination wherein the termination device is directly connected to the two conductors comprising the wired transmission-line, it will be appreciated that the invention can equally be applied to any type of termination arrangement or topology, such as serial (a.k.a back-matching), power and bi-directional, as described in National Semiconductor Corporation Application Note 903 (August 1993) entitled: "A Comparison of Differential Termination Techniques". Furthermore, the invention can be applied in both balanced and unbalanced lines, as well as in both lossy and lossless lines.

While the invention has been demonstrated above relating to a digital data communication comprising electrical signals propagating over wired transmission-line, it will be appreciated that the invention can equally be applied to any type of electrical signal, including analog signals.

While the invention has been described with regard to a metallic transmission-line comprising two conductors and carrying electrical signals, it will be appreciated that the invention can equally be applied to any type of transmission-line, including any electric wave transmission systems wherein electromagnetic wave energy is guided or constrained by a wave transmission guide. Such wave transmission lines include passive or active wave transmission networks simulating the characteristics of a long line wave transmission systems or wave guides, such as artificial lines, delay networks, resonators, impedance matching networks, equalizers, loaded lines and wave filters.

While the invention has been described with regard to a termination consisting of a single passive element (e.g. resistor), it will be appreciated that the invention can equally be applied to any type of termination arrangement, including passive or active elements, including impedance matching networks, hybrid networks, coupling networks, wave shaping networks, phase shifting networks, wave filters, equalizers and attenuators. Active elements include devices for producing across at least two of the system terminals a negative resistance, and/or an inductance, or capacitance, wherein each of the above may be positive or negative.

Public Notice Regarding the Scope of the Invention and Claims

While the invention has been described in terms of preferred embodiments and generally associated methods, the inventor contemplates that alterations and permutations of the preferred embodiments and methods will become apparent to those skilled in the art upon a reading of the specification and a study of the drawings.

Accordingly, neither the above description of preferred exemplary embodiments nor the abstract defines or con-

strains the invention. Rather, the issued claims variously define the invention. Each variation of the invention is limited only by the recited limitations of its respective claim, and equivalents thereof, without limitation by other terms not present in the claim. In addition, aspects of the invention are particularly pointed out in the claims using terminology that the inventor regards as having its broadest reasonable interpretation; more specific interpretations of 35 U.S.C. section. 112 (6) are only intended in those instances where the term "means" is actually recited. The words "comprising," "including," and "having" are intended as open-ended terminology, with the same meaning as if the phrase "at least" were appended after each instance thereof.

The invention claimed is:

1. A method for estimating the number of wire pairs connected to a single connection point, where each wire pair has a similar nominal characteristic impedance $Z0$, the method comprising:

connecting a characteristic impedance measuring device to the single connection point;

measuring, at the connection point, the lumped impedance $Z$ presented by the wire pairs adjacent the connection point;

calculating $Z0/Z$ to provide an estimate of the number of wire pairs connected to the single connection point; and

providing an output indicating the estimate of the number of wire pairs connected to the single connection point.

2. The method according to claim 1, further comprising storing a representation of the estimate of the number of wire pairs.

3. The method according to claim 2, further comprising providing a visual indication of the estimate of the number of wire pairs.

4. The method according to claim 1, wherein said step of providing an output comprises providing a visual indication of the estimate of the number of wire pairs.

5. The method according to claim 1, wherein the wire pairs are at least partially hidden in the wall of a building, the connection point is an outlet having a front faceplate, and connecting to the connection point comprises connecting to a connector on the front faceplate of the outlet.

6. The method according to claim 5, wherein the wire pairs form part of a telephone, AC power, or CATV wiring infrastructure, and the outlet is a telephone, AC power, or CATV outlet, respectively.

7. The method according to claim 6, wherein the infrastructure carries a signal in a first frequency band, and measuring the lumped impedance comprises transmitting energy to the connection point in a second frequency band distinct from the first frequency band.

8. The method according to claim 1, further comprising:

identifying a wiring end-point having a single connection wherein the connection point lumped impedance is $Z0$, and

connecting a termination to the connection point of the identified wiring end-point.

9. The method according to claim 1, wherein the wire pairs are at least partially hidden in the wall of a building, the connection point is an outlet, and connecting a characteristic impedance measuring device to the connection point comprises integrating the measuring device into the outlet.

10. The method according to claim 1, wherein a modem for communication is connected to the connection point, and said method further comprises a preliminary operation of disconnecting the modem from the connection point, and a subsequent operation of re-connecting the modem to the connection point.

11. The method according to claim 1, wherein measuring and calculating are initiated periodically, or upon application of an external signal.

12. The method according to claim 1, wherein said step of measuring is carried out in a manner to exclude the influence of reflections along each wire pair.

13. The method according to claim 1, wherein said step of measuring is carried out to measure only the lumped impedance $Z$ presented by the wire pairs.

14. A device for estimating the number of wire pairs connected to a single connection point, each wire pair has a similar nominal characteristic impedance $Z0$ and the wire pairs are all connected to the single connection point, said device comprising:

a port for connecting to the connection point,

a lumped impedance measuring unit coupled to said port for instantaneously measuring the connection point lumped impedance $Z$,

a $Z0/Z$ calculator coupled to the lump impedance measuring unit for estimating the connected wire pairs count to be $Z0/Z$; and

an output for indicating the estimate of the number of wire pairs connected to the single connection point.

15. The device according to claim 14, further comprising a memory coupled to said lump impedance measuring unit for storing a representation of calculated number of wire-pairs.

16. The device according to claim 15, wherein said comprising means for providing an output provide a visual indication of the estimate of the number of wire pairs.

17. The device according to claim 14, further comprising a visual indicator for displaying the calculated number of wire-pairs.

18. The device according to claim 14, for use when the wire pairs are at least partially hidden in a wall of a building, the connection point is an outlet having a front faceplate, wherein said port comprises a connector that mates to a complementary connector on the front faceplate of the outlet.

19. The device according to claim 18, wherein the wire pairs form part of a telephone, AC power, or CATV wiring infrastructure, the outlet is a telephone, AC power, or CATV outlet, respectively, and said connector is a telephone, AC power, or CATV plug, respectively.

20. The device according to claim 19, wherein the infrastructure carries a signal in a first frequency band, and said lump impedance measuring unit comprises:

an energy transmitter coupled to said connector for transmitting energy to the connection-point said energy being carried in a second frequency band distinct from the first frequency band.

21. The device according to claim 14, further comprising:

means for identifying a wiring end-point having a single connection wherein the connection point lumped impedance is $Z0$, and

means for connecting a termination to the connection-point of an identified wiring end-point.

22. The device according to claim 14, for use when the wire pairs are at least partially hidden in the wall of a building, wherein the connection point is an outlet, and said device is at least in part integrated into the outlet.

23. The device according to claim 14 for use with a modem for communication over the wire pairs, wherein the device further comprises a selective connection unit for disconnecting the modem from the connection point and for re-connecting the modem to the connection point.

24. The device according to claim 14, further comprising a selector for operating said device either periodically, or upon

US 7,521,943 B2

25

application of an external signal, or upon a manual action, or upon powering up of the device.

25. The device according to claim **14**, wherein said measuring unit is operative to exclude the influence of reflections along each wire pair.

26

26. The device according to claim **14**, wherein said measuring unit is operative to measure only the lumped impedance Z presented by the wire pairs.

\* \* \* \* \*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>Plaintiff,<br><br>v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. ----

# Exhibit B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

ATTY.'S DOCKET:  BINDER25

| | | |
|---|---|---|
| In re Application of: | ) | Office of the Deputy |
| | ) | Commissioner for Patent |
| Yehuda BINDER | ) | Examination Policy |
| | ) | |
| Patent No.:  7,521,943 | ) | Washington, D.C. |
| | ) | |
| Patent Date:  April 21, 2009 | ) | Confirmation No. 6803 |
| | ) | |
| For: DEVICE, METHOD AND SYSTEM | ) | June 22, 2009 |
| FOR ESTIMATING THE… | | |

REQUEST FOR RECONSIDERATION OF PATENT TERM ADJUSTMENT

Honorable Commissioner for Patents
U.S. Patent and Trademark Office
Customer Service Window
Randolph Building, Mail Stop Petitions
401 Dulany Street
Alexandria, VA 22314

Sir:

Pursuant to 37 CFR 1.705(d), reconsideration of the patent term adjustment indicated on the face of the above-identified patent is hereby requested.

In accordance with 37 CFR 1.705(b)(1), submitted herewith is the fee of $200 as set forth in 37 CFR 1.18(e). If there is any underpayment or any other fee necessary for consideration of this request, please charge same to the deposit account no. 02-4035 of the undersigned.

The following statement of the facts involved is in compliance with 37 CFR 1.705(b)(2).  The correct patent term adjustment is 1058 days.  The period of delay under 37 CFR

Patent No.:  7,521,943
Issue Date: April 21, 2009

1.702(a) is 751 days, as properly calculated by the PTO. However, the PTO failed to take into account the period of delay under 37 CFR 1.702(b).  The period of time from March 29, 2008 (three years after the Filing or 371(c) date) to issuance of the patent on April 21, 2009, was 388 days.

37 CFR 1.703(f) provides that the periods of delay under 1.702 are added together "to the extent that such periods are not overlapping."  In *Wyeth v. Dudas*, 2008 U.S. Dist. LEXIS 76063, 88 USPQ2d 1538 (D.D.C. Sept. 30, 2008), the U.S. District Court for the District of Columbia held that only periods of actual calendar days overlap between the time periods of delay calculated under 1.702(a) and 1.702(b) are to be considered as overlap within the meaning of 1.703(f). Thus, in this case, the only days of "overlap" are the 81 days of delay under 1.702(a) that occurred after March 29, 2008, which was the commencement of the 1.702(b) delay.  The 670 days of 1.702(a) delay that occurred prior to the commencement of the 1.702(b) delay must be added to the 388 days of delay under 37 CFR 1.702(b) to determine the total PTO delay, as per the interpretation required by the *Wyeth* court.

Thus, the period of patent term adjustment by the interpretation approved by the court in *Wyeth v. Dudas*, *supra*, is 751 + 388 − 81 = 1058 days, minus any period attributed to applicant's delay (37 CFR 1.704).  The PTO calculated applicant's delay as 0 days.  Thus, using the PTO's figures

- 2 -

Patent No.:  7,521,943
Issue Date: April 21, 2009

and the court's interpretation, the correct period for patent term adjustment should have been 1058 days, i.e., 1058 -0= 1058 days.  No terminal disclaimer has been filed in this case.

These issues could not have been raised on or before the date of payment of the issue fee as the period of adjustment under 1.702(b) did not become determined until the patent issued.  Indeed, the PTO does not consider the effect of the 1.702(b) period until it mails the issue notification.  Accordingly, this request for reconsideration of the patent term adjustment is timely under 37 CFR 1.705(d).

Granting of this request and modifying the patent term adjustment afforded this case to a total of 1058 days are therefore earnestly solicited.

Respectfully submitted,

BROWDY AND NEIMARK, P.L.L.C.
Attorneys for Applicant


By: /rlb/_____
    Roger L. Browdy
    Registration No. 25,618

RLB:edg
Telephone No.: (202) 628-5197
Facsimile No.: (202) 737-3528

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MOSAID TECHNOLOGIES INCORPORATED<br>11 Hines Road<br>Suite 203<br>Ottawa, Canada K2k 2x1<br><br>        Plaintiff,<br><br>                v.<br><br>HON. DAVID KAPPOS<br>Under Secretary of Commerce for Intellectual<br>Property and Director of the United States<br>Patent and Trademark Office<br>Madison Building<br>600 Dulany Street<br>Alexandria, VA 22314<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. ---- |

# Exhibit C

 UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

Paper No.

BROWDY AND NEIMARK, P.L.L.C.          **COPY MAILED**
624 NINTH STREET, NW
SUITE 300                             AUG 1 4 2009
WASHINGTON DC 20001-5303
                                      **OFFICE OF PETITIONS**

In re Patent No. 7,521,943       :
Binder et al.                    :   DECISION ON
Issue Date:  April 21, 2009      :   REQUEST FOR
Application No. 11/091,371       :   RECONSIDERATION OF
Filed:   March 29, 2005          :   PATENT TERM ADJUSTMENT
Attorney Docket No. BINDER25     :


This is a decision on the "REQUEST FOR RECONSIDERATION OF PATENT
TERM ADJUSTMENT," filed June 22, 2009, requesting that the
patent term adjustment determination for the above-identified
patent be changed from seven hundred fifty-one (751) days to one
thousand and fifty-eight (1058) days.

The request for reconsideration of patent term adjustment is
**DISMISSED**.

On April 21, 2009, the above-identified application matured into
US Patent No. 7,521,943 with a patent term adjustment of 751
days.  This request for reconsideration of patent term
adjustment was timely filed within two months of the issue date
of the patent.  See 37 C.F.R. § 1.705(d).

The Office acknowledges submission of the $200.00 fee set forth
in 37 C.F.R. § 1.18(e).  No additional fees are required.

Patentees request recalculation of the patent term adjustment to
include a 388-day period of adjustment pursuant to 37 C.F.R.
§ 1.703(b).  Patentees maintain entitlement to a period of
adjustment due to the Three Year Delay by the Office, pursuant
to 37 CFR § 1.703(b), of 388 days and the period of adjustment
due to other examination delay, pursuant to 37 CFR
§ 1.702(a)(1), of 751 days.

The 388-day period is calculated based on the application having been filed under 35 U.S.C. § 111(a) on March 29, 2005, and the instant patent issued on April 21, 2009, which is 3 years and 388 days after its filing date.

Under 37 CFR § 1.703(f), Patentees are entitled to a period of patent term adjustment equal to the period of delays based on the grounds set forth in 37 CFR § 1.702 reduced by the period of time equal to the period of time during which Patentees failed to engage in reasonable efforts to conclude prosecution pursuant to 37 CFR § 1.704.  In other words, the period of Office delay reduced by the period of applicant delay.

The period of reduction of 0 days for applicant delay is not in dispute.

The period of 751 days for Office delay is not in dispute.

Patentees do not dispute that the total period of Office delay is the sum of the period of Three Years Delay (388 days) and the period of Examination Delay (751 days) to the extent that these periods of delay are not overlapping. However, Patentees contend that 81 days of the Three Year Delay period overlaps with the period of 14-month examination delay.  Accordingly, Patentees submit that the total period of adjustment for Office delay is 1058 days, which is the sum of the period of Three Year Delay (388 days) and the period of Examination Delay (751 days), reduced by the period of overlap (81 days).

As such, Patentees assert entitlement to a patent term adjustment of 1058 days (388 + 751 reduced by 81 overlap − 0 (applicant delay)).

The Office agrees that the application issued 3 years and 388 days after its filing date.  The Office agrees that a certain action was not taken within the specified time frame, and thus, the entry of a period of adjustment of 751 days for Office delay is correct.  At issue is whether Patentees should accrue 307 days of patent term adjustment for the Office taking in excess of three years to issue the patent (388 days less the 81 days of overlap), as well as 751 days for Office failure to take a certain action within a specified time frame (or examination delay).

The Office contends that the entire 388-day period overlaps.
Patentees' calculation of the period of overlap is inconsistent
with the Office's interpretation of this provision.  35 U.S.C.
154(b)(2)(A) limits the adjustment of patent term, as follows:

> to the extent that the periods of delay attributable to
> grounds specified in paragraph (1) overlap, the period of
> any adjustment granted under this subsection shall not
> exceed the actual number of days the issuance of the
> patent was delayed.

Likewise, 37 CFR 1.703(f) provides that:

> To the extent that periods of delay attributable to the
> grounds specified in §1.702 overlap, the period of
> adjustment granted under this section shall not exceed the
> actual number of days the issuance of the patent was
> delayed.

As explained in *Explanation of 37 CFR 1.703(f) and of the United
States Patent and Trademark Office Interpretation of 35 U.S.C.
154(b)(2)(A)*, 69 Fed. Reg. 34283 (June 21, 2004), the Office
interprets 35 U.S.C. 154(b)(2)(A) as permitting either patent
term adjustment under 35 U.S.C. 154(b)(1)(A)(i)-(iv), or patent
term adjustment under 35 U.S.C. 154(b)(1)(B), but not as
permitting patent term adjustment under both 35 U.S.C.
154(b)(1)(A)(i)-(iv) and 154(b)(1)(B).  Accordingly, the Office
implements the overlap provision as follows:

> If an application is entitled to an adjustment under 35
> U.S.C. 154(b)(1)(B), the entire period during which the
> application was pending (except for periods excluded under
> 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not just the period
> beginning three years after the actual filing date of the
> application, is the period of delay under 35 U.S.C.
> 154(b)(1)(B) in determining whether periods of delay
> overlap under 35 U.S.C. 154(b)(2)(A).  Thus, any days of
> delay for Office issuance of the patent more than 3 years
> after the filing date of the application, which overlap
> with the days of patent term adjustment accorded prior to
> the issuance of the patent will not result in any
> additional patent term adjustment.  See 35 U.S.C.
> 154(b)(1)(B), 35 U.S.C. 154(b)(2)(A), and 37 CFR
> § 1.703(f).  See *Changes to Implement Patent Term
> Adjustment Under Twenty Year Term; Final Rule*, 65 Fed. Reg.

54366 (Sept. 18, 2000).  See also *Revision of Patent Term
Extension and Patent Term Adjustment Provisions; Final
Rule*, 69 Fed. Reg. 21704 (April 22, 2004), 1282 Off. Gaz.
Pat. Office 100 (May 18, 2004).  See also *Explanation of 37
CFR 1.703(f) and of the United States Patent and Trademark
Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, 69 Fed.
Reg. 34283 (June 21, 2004).

The current wording of § 1.703(f) was revised in response to the
misinterpretation of this provision by a number of Patentees.
The rule was slightly revised to more closely track the
corresponding language of 35 U.S.C. 154(b)(2)(A).  The relevant
portion differs only to the extent that the statute refers back
to provisions of the statute whereas the rule refers back to
sections of the rule.  This was not a substantive change to the
rule nor did it reflect a change of the Office's interpretation
of 35 U.S.C. 154(b)(2)(A).  As stated in the *Explanation of 37
CFR 1.703(f) and of the United States Patent and Trademark
Office Interpretation of 35 U.S.C. 154(b)(2)(A)*, the Office has
consistently taken the position that if an application is
entitled to an adjustment under the three-year pendency
provision of 35 U.S.C. 154(b)(1)(B), the entire period during
which the application was pending before the Office (except for
periods excluded under 35 U.S.C. 154(b)(1)(B)(i)-(iii)), and not
just the period beginning three years after the actual filing
date of the application, is the relevant period under 35 U.S.C.
154(b)(1)(B) in determining whether periods of delay "overlap"
under 35 U.S.C. 154(b)(2)(A).

This interpretation is consistent with the statute.  Taken
together the statute and rule provide that to the extent that
periods of delay attributable to grounds specified in 35 U.S.C.
154(b)(1) and in corresponding 37 C.F.R. § 1.702 overlap, the
period of adjustment granted shall not exceed the actual number
of days the issuance of the patent was delayed.  The grounds
specified in these sections cover the A) guarantee of prompt
Patent and Trademark Office responses, B) guarantee of no more
than 3 year application pendency, and C) guarantee or
adjustments for delays due to interference, secrecy orders and
appeals.  A section by section analysis of 35 U.S.C.
154(b)(2)(A) specifically provides that:

Section 4402 imposes limitations on restoration of term.
In general, pursuant to [35 U.S.C.] 154(b)(2)(A)-(C), total
adjustments granted for restorations under [35 U.S.C.

154](b)(1) are reduced as follows:    (1) To the extent that
there are multiple grounds for extending the term of a
patent that may exist simultaneously (e.g., delay due to a
secrecy order under [35 U.S.C.] 181 and administrative
delay under [35 U.S.C.] 154(b)(1)(A)), the term should not
be extended for each ground of delay but only for the
actual number of days that the issuance of a patent was
delayed; See 145 Cong. Rec. S14,718[1]

As such, the period for over 3 year pendency does not overlap
only to the extent that the actual dates in the period beginning
three years after the date on which the application was filed
overlap with the actual dates in the periods for failure of the
Office to take action within specified time frames.   In other
words, consideration of the overlap does not begin three years
after the filing date of the application.

In this instance, the relevant period under 35 U.S.C.
154(b)(1)(B) in determining whether periods of delay "overlap"
under 35 U.S.C. 154(b)(2)(A) is the entire period during which
the application was pending before the Office, March 29, 2005 to
April 21, 2009.   751 days of patent term adjustment were
accorded prior to the issuance of the patent for the Office
failing to respond within a specified time frame during the
pendency of the application.   All of the 388 days for Office
delay in issuing the patent overlap with the 751 days of Office
delay.   During that time, the issuance of the patent was delayed
by 751 days, not 751 + (388 − 81 = 307) days.   Other than the
period of Office delay pursuant to 37 C.F.R. §1.702(a)(1) which
totals 751 days, the Office took all actions set forth in 37
C.F.R. § 1.702(a) within the prescribed timeframes.

Nonetheless, given the initial 751 days of Office delay and the
2 days of applicant delay and the time allowed within the time
frames for processing and examination, the patent issued three
years and 388 days after its filing date.   The Office did not
delay 751 days and then an additional 307 days.   The 388 days
attributed to the delay in the issuance of the patent overlaps
with the adjustment of 751 days attributable to the grounds
specified in 37 C.F.R. § 1.702(a)(1).   Accordingly, at issuance,

---

[1]   The AIPA is title IV of the Intellectual Property and Communications Omnibus Reform Act of
1999 (S. 1948), which was incorporated and enacted as law as part of Pub. L. 106-113.   The
Conference Report for H.R. 3194, 106th.Cong. 1st Sess. (1999), which resulted in Pub. L. 106-113,
does not contain any discussion (other than the incorporated language) of S. 1948.   A section-by-
section analysis of S. 1948, however, was printed in the Congressional Record at the request of
Senator Lott, See 145 Cong. Rec. S14,708-26 (1999)(daily ed. Nov. 17, 1999).

Patent No. 7,521,943     Application No. 11/091,371      Page 6

the Office properly entered no additional days of patent term
adjustment for the Office taking in excess of 3 years to issue
the patent.  751 days is determined to be the actual number of
days that the issuance of the patent was delayed, considering
the 388 days over three years to the issuance of this patent.

In view thereof, no adjustment to the patent term will be made.

Telephone inquiries specific to this matter should be directed
to Paul Shanoski, Senior Attorney, at (571) 272-3225.

*Christina Paitera Donnell for*

Anthony Knight
Supervisor
Office of Petitions

**STATUTE AND REGULATION**

35 U.S.C. § 154(b) as amended by § 4402 of the American
Inventors Protection Act of 1999[2] (AIPA) provides that:

ADJUSTMENT OF PATENT TERM. —
(1)  PATENT TERM GUARANTEES. —
(A)  GUARANTEE OF PROMPT PATENT AND TRADEMARK
OFFICE RESPONSES. — Subject to the limitations under
paragraph (2), if the issue of an original patent is
delayed due to the failure of the Patent and Trademark
Office to —
(i)  provide at least one of the notifications under
section 132 of this title or a notice of allowance under
section 151 of this title not later than 14 months
after —
(I)  the date on which an application was filed under
section 111(a) of this title; or
(II) the date on which an international application
fulfilled the requirements of  section 371 of this title;
(ii)  respond to a reply under  section 132, or to an
appeal taken under section 134, within 4  months after the
date on which the reply was filed or the appeal was taken;
(iii) act on an application within 4  months after the
date of a decision by the Board of Patent Appeals and
Interferences under section 134 or 135 or a decision by a
Federal court under section 141,  145, or 146 in a case in
which allowable claims remain in the application; or
(iv)  issue a patent within 4 months after the date on
which the issue fee was paid under  section 151 and all
outstanding requirements were satisfied, the term of the
patent shall be extended 1 day for each day after the end
of the period specified in clause (i), (ii), (iii), or
(iv), as the case may be, until the action described
in such clause is taken.

(B)  GUARANTEE OF NO MORE THAN 3-YEAR APPLICATION
PENDENCY. — Subject to the limitations under paragraph (2),
if the issue of an original patent is delayed due to the
failure of the United States Patent and Trademark Office to
issue a patent within 3 years after the actual filing date
of the application in the United States, not including —

---

[2]   Public Law 106-113, 113 Stat. 1501, 1501A-557 through 1501A-560 (1999).

(i)   any time consumed by continued examination of the application requested by the applicant under  section 132(b);

(ii)   any time consumed by a proceeding under  section 135(a), any time consumed by the imposition of an order under section 181, or any time consumed by appellate review by the Board of Patent Appeals and Interferences or by a Federal court; or

(iii) any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C), the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

(C)   GUARANTEE OR ADJUSTMENTS FOR DELAYS DUE TO INTERFERENCES, SECRECY ORDERS, AND APPEALS. — Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to —

(i)   a proceeding under section 135(a);

(ii)  the imposition of an order under  section 181; or

(iii) appellate review by the Board of Patent Appeals and Interferences or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability, the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

(2)   LIMITATIONS. —

(A)   IN GENERAL. — To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

The implementing regulation, 37 CFR § 1.702, provides grounds for adjustment of patent term due to examination delay under the Patent Term Guarantee Act of 1999 (original applications, other than designs, filed on or after May 29, 2000).

(a)   Failure to take certain actions within specified time frames.  Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be

adjusted if the issuance of the patent was delayed due to the failure of the Office to:

(1)   Mail at least one of a notification under 35 U.S.C. 132 or a notice of allowance under 35 U.S.C. 151 not later than fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or fulfilled the requirements of 35 U.S.C. 371 in an international application;

(2)   Respond to a reply under 35 U.S.C. 132 or to an appeal taken under 35 U.S.C. 134 not later than four months after the date on which the reply was filed or the appeal was taken;

(b)   Failure to issue a patent within three years of the actual filing date of the application.  Subject to the provisions of 35 U.S.C. 154(b) and this subpart, the term of an original patent shall be adjusted if the issuance of the patent was delayed due to the failure of the Office to issue a patent within three years after the date on which the application was filed under 35 U.S.C. 111(a) or the national stage commenced under 35 U.S.C. 371(b) or (f) in an international application, but not including[3]:

In pertinent part, 37 CFR § 1.703 provides for calculation of the periods, as follows:

Period of adjustment of patent term due to examination delay.

(a)   The period of adjustment under § 1.702(a) is the sum of the following periods:

(1)   The number of days, if any, in the period beginning on the day after the date that is fourteen months after the date on which the application was filed under 35 U.S.C. 111(a) or fulfilled the requirements of 35 U.S.C. 371 and ending on the date of mailing of either an action under 35 U.S.C. 132, or a notice of allowance under 35 U.S.C. 151, whichever occurs first;

(b) The period of adjustment under § 1.702(b) is the number of days, if any, in the period beginning on the day

---

[3]      (1)   Any time consumed by continued examination of the application under 35 U.S.C. 132(b);

(2)   Any time consumed by an interference proceeding under 35 U.S.C. 135(a);

(3)   Any time consumed by the imposition of a secrecy order under 35 U.S.C. 181;

(4)   Any time consumed by review by the Board of Patent Appeals and Interferences or a Federal court; or

(5)   Any delay in the processing of the application by the Office that was requested by the applicant.

Patent No. 7,521,943        Application No. 11/091,371        Page 10

after the date that is three years after the date on which
the application was filed under 35 U.S.C. 111(a) or the
national stage commenced under 35 U.S.C. 371(b) or (f) in
an international application and ending on the date a
patent was issued, but not including the sum of the
following periods[4]:

37 CFR 1.703(f) provides that:

The adjustment will run from the expiration date of the
patent as set forth in 35 U.S.C. 154(a)(2). To the extent
that periods of delay attributable to the grounds
specified in §1.702 overlap, the period of adjustment
granted under this section shall not exceed the actual
number of days the issuance of the patent was delayed. The
term of a patent entitled to adjustment under § 1.702 and
this section shall be adjusted for the sum of the periods
calculated under paragraphs (a) through (e) of this
section, to the extent that such periods are not
overlapping, less the sum of the periods calculated under
§ 1.704. The date indicated on any certificate of mailing
or transmission under § 1.8 shall not be taken into account
in this calculation.

---

[4] (1) The number of days, if any, in the period beginning on the date on which a request for
continued examination of the application under 35 U.S.C. 132(b) was filed and ending on the date
the patent was issued;
    (2)(i) The number of days, if any, in the period beginning on the date an interference was
declared or redeclared to involve the application in the interference and ending on the date that
the interference was terminated with respect to the application; and (ii) The number of days, if
any, in the period beginning on the date prosecution in the application was suspended by the
Office due to interference proceedings under 35 U.S.C. 135(a) not involving the application and
ending on the date of the termination of the suspension;
    (3)(i) The number of days, if any, the application was maintained in a sealed condition under
35 U.S.C. 181; (ii) The number of days, if any, in the period beginning on the date of mailing of
an examiner's answer under § 41.39 of this title in the application under secrecy order and
ending on the date the secrecy order was removed; (iii) The number of days, if any, in the period
beginning on the date applicant was notified that an interference would be declared but for the
secrecy order and ending on the date the secrecy order was removed; and (iv) The number of days,
if any, in the period beginning on the date of notification under § 5.3(c) of this chapter and
ending on the date of mailing of the notice of allowance under 35 U.S.C. 151; and,
    (4) The number of days, if any, in the period beginning on the date on which a notice of
appeal to the Board of Patent Appeals and Interferences was filed under 35 U.S.C. 134 and § 41.31
of this title and ending on the date of the last decision by the Board of Patent Appeals and
Interferences or by a Federal court in an appeal under 35 U.S.C. 141 or a civil action under 35
U.S.C. 145, or on the date of mailing of either an action under 35 U.S.C. 132, or a notice of
allowance under 35 U.S.C. 151, whichever occurs first, if the appeal did not result in a decision
by the Board of Patent Appeals and Interferences.